## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| John C. Distefano and goDesk, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>Nordic Consulting Partners, Inc.<br><br>    Defendant. | Civil No. 3:23-cv-00657-wmc |

## <u>DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' AMENDED COMPLAINT</u>

Defendant, Nordic Consulting Partners, Inc. ("**Defendant**") hereby files its answer and affirmative defenses to Plaintiffs, John C. Distefano's, ("**Mr. Distefano**"), and goDesk, LLC's ("**goDesk**") (collectively "**Plaintiffs**") amended complaint (Dkt. 47), and Defendant counterclaims for damages against Plaintiffs. Defendant answers and alleges as follows:

<u>NATURE OF THE ACTION</u>

1.      This is an action by Plaintiff Distefano for damages arising from breach of a written contract, intentional misrepresentations, breach of an oral contract, and in the alternatives, breach of implied contract or unjust enrichment, arising out of the theft of Plaintiff Distefano's intellectual property and consumer-centric healthcare software platform.

**ANSWER:**    Defendant admits that this purports to be an action by Mr. Distefano seeking damages. Defendant denies the remaining allegations in this paragraph, and specifically denies that Nordic made any misrepresentations to Mr. Distefano or others.

2.      In addition, this is an action by Plaintiff goDesk for damages arising from breach of a written contract, and intentional misrepresentations, arising out of the theft of intellectual property belonging to its personnel.

**ANSWER:**    Defendant admits that this purports to be an action by goDesk seeking damages. Defendant denies the remaining allegations in this paragraph, and specifically denies that Nordic made any misrepresentations to Mr. Distefano or others.

## THE PARTIES

3.    Plaintiff, John C. Distefano, is a citizen and resident of Collier County, Florida.

**ANSWER:**    Defendant is without sufficient information or belief as to the allegations in this paragraph and therefore denies them.

4.    Plaintiff, goDesk, LLC, is a Florida limited liability company with its principal place of business in Collier County, Florida.

**ANSWER:**    Defendant is without sufficient information or belief as to the allegations in this paragraph and therefore denies them.

5.    Defendant, Nordic Global Consulting, Inc. ("Nordic"), is a Wisconsin corporation, with its principal place of business in Dane County, Wisconsin.

**ANSWER:**    Defendant denies that Nordic Global Consulting, Inc. is the defendant in this litigation.  Plaintiffs filed this case against Defendant, Nordic Consulting Partners, Inc. ("Nordic"). Defendant admits that Nordic Consulting Partners, Inc. is a Wisconsin corporation, with its principal place of business in Dane County, Wisconsin.

## JURISDICTION AND VENUE

6.    This Court has subject matter and personal jurisdiction over the Defendant by virtue of an Order entered by the Middle District of Florida on September 21, 2023, transferring the case to the Western District of Wisconsin [Doc. 34], and venue is proper in this Court also by virtue of the Order.

**ANSWER:**    Admitted that this Court has subject matter jurisdiction over Plaintiffs' claims. Defendant denies the remaining allegations in this paragraph, to the extent there are any.

7.    All conditions precedent to the institution and maintenance of this action have occurred or have been performed, completed or waived.

**ANSWER:**    Admitted.

## FACTUAL BACKGROUND

8.    As set forth below, the Plaintiff Mr. Distefano conceived a consumer-centric healthcare platform that was based on his highly successful, respected, and well-known thirty-year career as an advisor and consultant in the healthcare field with the firm of Ernst & Young Global Limited ("Ernst & Young") among other professional services firms.

2

**ANSWER:**    Defendant admits that Mr. Distefano worked as an advisor and consultant in the healthcare field, including with the firm of Ernst & Young Global Limited ("Ernst & Young"). Defendant is without sufficient information or belief as to the remaining allegations in this paragraph and therefore denies them

9.    Mr. Distefano's experience includes decades of architecting massive scale data models and data applications for Mastercard, Disney, Anthem BCBS, and many more healthcare organizations. He has a bachelor's degree in quantitative science and a master's degree in information management both from Washington University. He also co-authored a 600+ page book published in 2002 by Wiley & Sons titled "Wireless Enterprise Application Architecture." Mr. Distefano was also named one of the nation's Top 25 Consultants by Consulting Magazine in 2012 for Excellence in Healthcare.

**ANSWER:**    Defendant is without sufficient information or belief as to the allegations in this paragraph and therefore denies them.

10.    Over his career Mr. Distefano was sought out to provide advisory and consultancy services to grow businesses in the healthcare field. In 2019, Mr. Distefano semi-retired and began working on his consumer-centric healthcare software platform (the "Software Platform") that included his vision, conceptual design, functional design, and business requirements.

**ANSWER:**    Defendant is without sufficient information or belief as to the allegations in this paragraph and therefore denies them.

11.    Mr. Distefano's Software Platform was based on his decades of healthcare expertise, experience with some of the biggest data projects in the industry, and knowledge of proprietary consumer incentive structures.

**ANSWER:**    Defendant is without sufficient information or belief as to the allegations in this paragraph and therefore denies them.

12.    Beginning in November, 2019, Mr. Distefano translated portions of his Software Platform comprising concepts, materials, and other intellectual property into a fixed, tangible expression in the form of a literary work, which is protected by Federal Copyright Registration TXu002391374. A copy of the certificate of copyright registration is attached hereto as Exhibit A.

**ANSWER:**    Defendant is without sufficient information or belief as to the allegations in this paragraph and therefore denies them.

13.     Mr. Distefano first approached InComm Health Care ("InComm") in February 2020 to jointly write the software code for the Software Platform and provided a live presentation explaining the consumer-centric healthcare Software Platform, how it works, and its value.

**ANSWER:**     Defendant is without sufficient information or belief as to the allegations in this

paragraph and therefore denies them.

14.     InComm designs and develops software directed to prepaid health benefit services and payment solutions, which enables retailers, employer groups, health plans and health providers to track consumer purchases among other things.

**ANSWER:**     Defendant is without sufficient information or belief as to the allegations in this

paragraph and therefore denies them.

15.     InComm at that time was not positioned to invest the strategic bandwidth nor healthcare subject matter expertise to write the code for the Software Platform, however, InComm would subsequently enter into a strategic data partnership to leverage its proprietary datasets through the Software Platform.

**ANSWER:**     Defendant is without sufficient information or belief as to the allegations in this

paragraph and therefore denies them.

16.     Around this same time Mr. Distefano was contacted by James Costanzo ("Mr. Costanzo") who was the Chief Executive Officer of the Defendant Nordic. Mr. Costanzo and Mr. Distefano had worked closely together for more than 20 years as partners at Ernst & Young and other firms. Mr. Costanzo respected Mr. Distefano's abilities as a consultant and advisor, and on more than one occasion Mr. Distefano and Mr. Costanzo had discussed starting a business of their own.

**ANSWER:**     Defendant admits that Mr. Costanzo was the CEO of Nordic in February 2020, and

that Mr. Costanzo and Mr. Distefano previously worked together, including at Ernst & Young.

Defendant denies the remaining allegations in this paragraph.

17.     Nordic was an information technology (IT) staffing company that had hundreds of individual subcontractors that included software programmers. Hospitals and other healthcare facilities from all over the country would hire Nordic to install electronic healthcare record (EHR) software, which is a relatively complex undertaking, and Nordic would in turn activate a team of its subcontractors and employees to perform the installation.

**ANSWER:** Defendant denies that Nordic had hundreds of individual subcontractors. Defendant denies that Nordic regularly engages subcontractors to perform client implementation work. Defendant admits the remaining allegations in this paragraph.

18. Mr. Costanzo had been hired to grow Nordic in order to sell it to a third party. However, an IT staffing company is not relatively valuable but adding consultancy and advisory services to Nordic would substantially increase its overall value.

**ANSWER:** Defendant admits that Nordic hired Mr. Costanzo. Defendant denies the remaining allegations in this paragraph.

19. Accordingly, Mr. Costanzo first reached out to Mr. Distefano in February 2020, to build and grow the newly formed consultancy and advisory services division for Nordic. The initial discussions between Mr. Costanzo and Mr. Distefano took place February 4, 2020 and March 26, 2020.

**ANSWER:** Defendant admits that Mr. Costanzo and Mr. Distefano discussed Mr. Distefano leading Nordic's advisory services division. Defendant is without sufficient information or belief regarding the exact dates of the Mr. Costanzo and Mr. Distefano's discussions, and therefore denies the allegations in this paragraph regarding such dates. Defendant denies any remaining allegations in this paragraph.

A.    Wheels Set in Motion

April 1, 2020

20. During their subsequent meeting on April 1, 2020, Mr. Distefano explained to Mr. Costanzo that he was doing some independent consulting but was mostly retired from the advisory and consultancy business. Accordingly, Mr. Distefano was not interested in a full-time position at Nordic so any advisory consulting role that he would accept would be limited and as a subcontractor. Mr. Distefano described his expectation of being able to provide about 80 or so hours a month to Nordic.

**ANSWER:** Denied.

21. In particular, he explained to Mr. Costanzo that he had developed a consumer-centric healthcare Software Platform and was looking for partners as evidenced from his recent meeting with InComm described above.

**ANSWER:** Denied.

22.     Mr. Distefano and Mr. Costanzo discussed the Software Platform and whether there may be a good match with having Nordic as a partner for the Software Platform.

**ANSWER:**    Denied.

23.     In fact, after these discussions and teleconference meetings (in person meetings were precluded at this time due to travel restrictions during COVID-19), Mr. Costanzo stated to Mr. Distefano that it sounded like a great idea to have Nordic jointly write the code for the Software Platform under Mr. Distefano's control and direction and using his intellectual property. Costanzo declared "we have hundreds of digital engineers to do the build."

**ANSWER:**    Denied.

24.     Mr. Costanzo agreed that as part of the plan they, Nordic and Mr. Distefano, would also spin-out a new jointly owned company to monetize the Software Platform using Mr. Distefano's top-level contacts with health industry companies. Mr. Costanzo always represented and acknowledged from April 1, 2020, through January, 25, 2023, that Mr. Distefano was, and would always be, the owner of the Software Platform along with other related materials and that Nordic would simply be a partner in monetizing the Software Platform.

**ANSWER:**    Denied.

25.     We know now that this was an intentional misrepresentation by Mr. Costanzo that induced Mr. Distefano to get involved with Nordic. Instead, it was always Nordic's position that Mr. Distefano would have no ownership in the software code and other materials related to the Software Platform that would enable Mr. Distefano to monetize the Software Platform.

**ANSWER:**    Denied.

26.     At no time did Mr. Costanzo represent orally, or in writing, to Mr. Distefano that everything Nordic would be doing related to the Software Platform would be solely owned by Nordic rather than being partners. This fact was peculiarly and exclusively within the knowledge of Mr. Costanzo as CEO of Nordic, and Mr. Distefano could not reasonably be expected to discover it.

**ANSWER:**    Denied.

27.     The joint intention and representations made by Mr. Costanzo on April 1, 2020, included that Mr. Distefano would contribute his copyrighted materials and other intellectual property of the Software Platform, he would control and direct the overall development of the body of software code at issue here, and that Mr. Distefano's contributions would be merged with Nordic's contributions (if any) into inseparable or interdependent parts of a unitary work. In addition, Mr. Costanzo represented that Nordic and Mr. Distefano would spinout a jointly owned company to monetize the Software Platform.

**ANSWER:**    Denied.

28.     Once Mr. Costanzo made the foregoing representations on which Mr. Distefano reasonably relied, Mr. Distefano met with key stakeholders over the next 30 days. This included meeting with his contacts at Cambia Health Solutions twice (April 9, 2020 and April 22, 2020), InComm Healthcare twice (April 7, 2020 and April 20, 2020), and also Nordic Digital Health leader Sriram Devarakonda on April 14, 2020. The wheels were now set in motion upon which this dispute is based.

**ANSWER:**     Defendant is without sufficient information or belief as to the allegations regarding the dates of Plaintiffs' meeting with Cambia Health Solutions, if any, the dates of Plaintiffs' meeting with InComm Healthcare, if any, and the date of Plaintiffs' meeting with Sriram Devarakonda, and therefore denies them.  Defendant denies the remaining allegations in this paragraph.

B.     The Master Services Agreement, First Statement of Work

May 11, 2020

29.     Separate and apart from the representations of Mr. Costanzo for the agreement to jointly write the software code and monetize Mr. Distefano's Software Platform, Mr. Distefano's company goDesk, LLC ("goDesk") entered into a written May 2020, Subcontractor Master Services Agreement attached hereto as Exhibit B, and a corresponding First Statement of Work attached hereto as Exhibit C.

**ANSWER:**     Defendant admits that goDesk and Nordic entered into a written Subcontractor Master Services Agreement ("MSA") and a corresponding First Statement of Work ("First SOW") in May 2020, as represented by Exhibits B and C attached to the Amended Complaint.  Defendant denies the remaining allegations in this paragraph.

30.     goDesk was also providing consulting services to other companies such as InComm and Cambia Health Solutions during this time. To be clear, goDesk being contracted by Nordic under the Subcontractor Master Services Agreement and First Statement of Work was not conditioned or related to Mr. Distefano partnering with Nordic on the Software Platform.

**ANSWER:**     Defendant admits that the MSA and the First SOW were not conditioned on any work related to the Software Platform or Wellward.  Defendant denies that Mr. Distefano's work on the Software Platform or Wellward was not related to the MSA or the First SOW.  Defendant denies that Nordic partnered with Mr. Distefano on the Software Platform or Wellward.  Defendant

is without sufficient information or belief as to the remaining allegations in this paragraph and

therefore denies them.

31.     The Subcontractor Master Services Agreement contained general contractual provisions, and the First Statement of Work provided a detailed description of services that were to be provided by goDesk. Mr. Distefano was listed as the "personnel" of goDesk on the First Statement of Work.

**ANSWER:**     Admitted.

32.     The First Statement of Work had a start date of May 18, 2020, and end date of December 31, 2020. The First Statement of Work also provided that "[t]he terms of this agreement will automatically renew at the end of each term for a further term of 6 months unless either party gives the other written notice of termination at least 30 days prior to the end of the relevant term."

**ANSWER:**     Admitted.

33.     As explained above, Nordic was looking for a consultant that could build Nordic's newly formed consultancy and advisory services. As such, the First Statement of Work with goDesk was directed to advisory services and recited in pertinent part, "[d]uring the term of this engagement, you will provide leadership and subject matter expertise to the leadership of the newly formed Advisory Services division within Nordic. This includes drawing on your experiences to provide consultative advice on scaling an effective business model, developing executive relationships, solutions development and pricing, and staff management and utilization."

**ANSWER:**     Admitted.

34.     goDesk does not own any intellectual property and Mr. Distefano's Software Platform was not connected to any of the Services that were provided by goDesk and its personnel pursuant to the First Statement of Work, nor is the subject matter of the First Statement of Work directed to the Software Platform. Mr. Costanzo had also confirmed and represented on April 1, 2020, that any work related to Mr. Distefano's Software Platform was not in connection with any Services that would be provided by goDesk.

**ANSWER:**     Defendant is without sufficient information or belief about whether goDesk owns

any intellectual property. Defendant denies the remaining allegations in this paragraph.

35.     In addition, Contract Property as defined in section 2.C of the Master Services Agreement provided as follows,

> Notwithstanding anything herein to the contrary, to the extent that the Services use concepts, materials, ideas, or other intellectual property previously developed by Subcontractor (the "Reusable Concepts") or software code or programs which have been or will be developed by Subcontractor to perform generalized functions or routines which were not

initially developed as part of the Services performed under this Agreement (the "Proprietary Programs"), Subcontractor shall maintain ownership of the intellectual property rights in such Reusable Concepts and Proprietary Programs....

**ANSWER:** Defendant admits that the MSA includes the provision set forth in this paragraph. Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the terms of the MSA.

36. The express language of the Master Services Agreement exempted all concepts, materials, ideas, and other intellectual property that were previously developed by goDesk or its personnel, i.e., Mr. Distefano, from being Contract Property.

**ANSWER:** Defendant admits that the MSA includes a provision exempting intellectual property previously developed by goDesk or its personnel, *i.e.*, Mr. Distefano, from being Contract Property. Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the terms of the MSA.

37. Accordingly, any software code, schematics, flowcharts, presentations, slides, sales and marketing materials, derivative works of any of the foregoing, and other materials related to the Mr. Distefano's Software Platform were never intended and are not Nordic property because they were not developed or created in connection with the Services of the First Statement of Work or were Mr. Distefano's previously developed intellectual property.

**ANSWER:** Denied.

C.    Performance

May 11, 2020 through November 30, 2021

38. Mr. Distefano reasonably relied on Mr. Costanzo's representations to partner with Nordic to jointly write the code for his software platform and to form a new jointly owned company to monetize the software platform together. Mr. Distefano changed his position to his detriment based on such reliance as explained below.

**ANSWER:** Denied.

39. To begin with, it is undisputed that goDesk successfully built the advisory and consultancy services for Nordic during 2020 and 2021 under the terms of the First Statement of Work and increased the value of Nordic substantially.

**ANSWER:** Defendant admits that Mr. Distefano performed work for Nordic's advisory services group under the terms of the First SOW. Defendant denies any remaining allegations in this paragraph.

40. For example, goDesk led Nordic's Advisory Services to year-over-year revenue increase in 2020 despite pandemic pressures, while the rest of Nordic US shrank; led Advisory Services to year-over-year revenues increase in 2021 nearly 30%, while the rest of Nordic US grew only 6%; actual EBITDA contribution for the Nordic Advisory business division increased to $40.9 million in 2021, adding a reported $90-100m to the Nordic acquisition price; and Nordic Advisory Services received acknowledgement by prominent industry research group KLAS in February, 2022 for three Best in KLAS awards.

**ANSWER:** Defendant admits that Mr. Distefano performed work for Nordic's advisory services group under the terms of the First SOW. Defendant denies any remaining allegations in this paragraph.

41. Mr. Costanzo's letter of May 26, 2022, acknowledged that "... [goDesk] has helped take our Advisory business to new heights," and "Under John's stewardship, One Advisory became more than a tag line as Nordic transformed its resource model, integrated business lines, dramatically increased deal size, and introduced innovative solutions leading Nordic to three Best in KLAS awards this past year. I am grateful for the time he has given Nordic..."

**ANSWER:** Defendant denies that the May 26, 2022 letter from Mr. Costanzo "acknowledged" anything. Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the letter.

42. Also, during this time, Mr. Distefano, individually and on his own time without any compensation from Nordic, moved forward with the software code for his Software Platform and was the only one who directed the software programmers and maintained overall control of the code for the Software Platform.

**ANSWER:** Denied.

43. On May 27, 2021, Mr. Costanzo and Mr. Distefano traveled to Miami, Florida to meet with Dr. David Seo, Chief Medical Informatics Officer at Nicklaus Childrens Hospital. Mr. Costanzo and Mr. Distefano agreed to recruit an independent third-party subject matter expert to serve as clinical advisor for the Software Platform. During the dinner meeting Mr. Costanzo informed Dr. Seo that Mr. Distefano is "the mastermind behind the [software] platform."

**ANSWER:** Defendant admits that Mr. Costanzo and Mr. Distefano met with Dr. Seo in Florida. Defendant is without sufficient information or belief regarding the exact dates of the meeting with Dr. Seo, and therefore denies the allegations in this paragraph regarding such dates. Defendant denies any remaining allegations in this paragraph.

44. Dr. Seo commented on the differentiation of the Software Platform and huge opportunity to monetize during the meeting. Mr. Costanzo agreed and stated "John and his team are building what others have tried but haven't done before."

**ANSWER:** Denied.

45. On August 9, 2021, Mr. Costanzo and Mr. Distefano hosted an after dinner gathering in Las Vegas during the HIMSS industry conference. Also attending were Nordic executives including Ms. Shannon Yasseri and Mr. Jeff Jackson, among others. Mr. Costanzo recapped his discussions thus far with private equity firms regarding the sale of Nordic.

**ANSWER:** Defendant admits that Mr. Costanzo and Mr. Distefano hosted an after dinner gathering in Las Vegas during the HIMSS industry conference. Defendant is without sufficient information or belief regarding the exact dates of the dinner or the other individuals in attendance, and therefore denies the allegations in this paragraph regarding such dates and persons in attendance. Defendant denies any remaining allegations in this paragraph.

46. Mr. Costanzo also told the group about creating value not only through the sale of Nordic but also through a "second capital event" involving the Software Platform with Mr. Distefano at the helm.

**ANSWER:** Denied.

47. On October 26, 2021, Mr. Distefano met with Mr. Costanzo to discuss the Software Platform and forming the new jointly owned company as a result of Mr. Costanzo informing Mr. Distefano that he wanted to hire him as an executive Nordic employee.

**ANSWER:** Defendant admits that Mr. Distefano and Mr. Costanzo met in or around October 2021 and discussed Mr. Distefano joining Nordic as an executive employee. Defendant denies the remaining allegations in this paragraph.

48.     Mr. Costanzo wanted to bring Mr. Distefano, individually, on as an executive employee of Nordic because up until this time, Nordic only had a written subcontractor agreement with goDesk to provide the consulting services as discussed above.

**ANSWER:**     Defendant admits that Mr. Distefano and Mr. Costanzo met in or around October 2021 and discussed Mr. Distefano joining Nordic as an executive employee.  Defendant admits that in or around October 2021, Nordic and Mr. Distefano (through goDesk) were parties to the MSA and the First SOW.  Defendant denies any remaining allegations in this paragraph.

49.     Mr. Costanzo represented that he wanted to make Mr. Distefano an executive employee of Nordic so that Nordic would appear to be more stable and reputable to potential buyers of Nordic.

**ANSWER:**     Denied.

50.     A draft Employment Agreement was provided to Mr. Distefano to review.

**ANSWER:**     Admitted.

51.     Mr. Distefano had concerns that becoming an employee of Nordic would affect ownership rights of the Software Platform and his ongoing work to complete the software code and to monetize the Software Platform.

**ANSWER:**     Defendant denies that Mr. Distefano had any ownership rights in any portion of the Software Platform, including the software code.  Defendant is without sufficient information or belief regarding any remaining allegations in this paragraph and therefore denies them.

52.     Accordingly, Mr. Distefano proposed changes to the draft Employment Agreement to clarify that his past and ongoing work on the Software Platform with Nordic's programmers was exempt under the Employment Agreement and that the Software Platform was not Nordic property. He also proposed changes to clarify that any intellectual property to date that had been developed was also exempted from ownership by Nordic, which would include the functional demonstration version of Mr. Distefano's Software Platform.

**ANSWER:**     Defendant admits that Mr. Distefano proposed changes to the draft Employment Agreement.  Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the terms of the Employment Agreement.  Defendant denies that Mr. Distefano's work with Nordic's programmers was exempt under the Employment Agreement.  Defendant

denies that the Software Platform was not Nordic property.  Defendant denies that any functional

demonstration version of the Software Platform was not Nordic property.  Defendant denies any

remaining allegations in this paragraph.

53.    On October 27, 2021, Distefano emailed Nordic's Head of Human Resources, Ms. Heather Becker, stating "I had a chance to connect with Jim [Costanzo] regarding a question I had regarding IP in the employment agreement. All square now...I can update with the recommended revised language and can submit for review."

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is

inconsistent with the email.

54.    In particular, Mr. Distefano made sure the following language was included, which was accepted by Nordic:

> Notwithstanding the foregoing, the definition of Company Works does not include any works of authorship, inventions, intellectual property, materials, documents or other work product developed (alone or jointly) by the Employee (i) entirely on the Employee's own time and " (ii) any concepts, materials, ideas, or other intellectual property previously developed by Employee.

**ANSWER:**    Defendant admits that the Employment Agreement contains the provision

reproduced in this paragraph.  Defendant denies any allegations in this paragraph to the extent such

allegation is inconsistent with the terms of the Employment Agreement.  Defendant denies any

remaining allegations in this paragraph.

55.    The first subsection (i) clarified that his work on the Software Platform that he was doing on his own time either alone or jointly, was exempt and not Company Works and not Nordic's Property under the Employment Agreement.

**ANSWER:**    Defendant admits that the Employment Agreement includes a provision related to

Company Works.  Defendant denies any allegations in this paragraph to the extent such allegation

is inconsistent with the terms of the Employment Agreement.  Defendant denies that Mr. Distefano

was doing any work on the Software Platform on his own time to the extent that the work used

Nordic resources or was built on work created using Nordic resources.  Defendant denies any

remaining allegations in this paragraph.

57.    The second subsection (ii) clarified that any intellectual property to date that had
been developed was also exempt and not Company Works under the Employment Agreement.


56.    As Mr. Distefano was an executive employee, there were no set hours or required
minimum number of hours under the Employment Agreement that he was required to devote to
advisory services versus his "own time" that he spent on his Software Platform.

**ANSWER:**    Denied.

57.    The second subsection (ii) clarified that any intellectual property to date that had
been developed was also exempt and not Company Works under the Employment Agreement.

**ANSWER:**    Denied.

58.    Thus, anything Mr. Distefano already had created or developed up until the time
the Employment Agreement was executed on December 1, 2021, was also not Company Works
and not Nordic's property.

**ANSWER:**    Denied.

59.    As explained in more detail below, Nordic breached both of these provisions of the
Employment Agreement on January 26, 2023.

**ANSWER:**    Denied.

60.    In addition, Nordic breached the Master Services Agreement and First Statement
of Work by failing to pay all the fees and expenses required. Although the Employment Agreement
had an effective date of December 1, 2021, the terms of the Subcontractor Master Services
Agreement did not end until December 31, 2021, due to the automatic 6-month renewal terms.
Nordic breached the Subcontractor Master Services Agreement and the First Statement of Work
by failing to pay goDesk through the end of the term that ended on December 31, 2021.

**ANSWER:**    Denied.

D.    The Employment Agreement

December 1, 2021 – August 21, 2022

61.    A functional demonstration of Mr. Distefano's Software Platform was given to Mr.
Costanzo and Molly Swift, who was the COO of Nordic, on November 1, 2021. Subsequent to that
demonstration, Mr. Distefano executed the Employment Agreement with the revised language.
The Employment Agreement is attached hereto as Exhibit D.

**ANSWER:**    Defendant admits that Mr. Distefano executed the Employment Agreement.

Defendant denies any remaining allegations in this paragraph.

62. Everything seemed to be going as planned towards a fully operational version of the Software Platform and to monetize the Software Platform as partners but an issue quickly arose as to the Employment Agreement.

**ANSWER:** Denied.

63. As mentioned above, Nordic was busy trying to attract a third-party to acquire Nordic. As part of that process to obtain the highest purchase price, Mr. Distefano became aware that Mr. Costanzo appeared to overstate and misrepresent sales, revenue and earnings on financial documents in an effort to artificially increase the value of Nordic.

**ANSWER:** Denied.

64. Mr. Distefano pointed out in multiple meetings with Mr. Costanzo (February 1, 2022, February 2, 2022, February 14, 2022, February 21, 2022) that he believed representing an amount of booked sales that included multiple millions of dollars of sales that had already cancelled or likely to cancel would artificially overstate 2022 revenue backlog, and also attempting to increase 2021 annual earnings by recognizing contingent performance payments yet to be received from the client, underfunding and some cases even reversing staff bonus accruals, was providing misleading financials to potential purchasers. The eventual purchaser of Nordic likely found that revenue and earnings in 2022 did not materialize according to the financials presented during the purchase process.

**ANSWER:** Denied.

65. Accordingly, Mr. Distefano decided to terminate his employment in February 2022, wanting no part of the intentional and bad faith financial misrepresentations that were approved and perpetuated directly by Mr. Costanzo as CEO of Nordic.

**ANSWER:** Defendant admits that in February 2022, Mr. Distefano gave notice that he intended to terminate his employment with Nordic. Defendant denies that such termination was effective in February 2022. Defendant denies that Nordic or Mr. Costanzo made, approved, or perpetuated any intentional or bad faith financial misrepresentations. Defendant denies any remaining allegations in this paragraph.

66. Pursuant to section 5(f) of the Employment Agreement, Mr. Distefano provided a Notice of Termination, and entered a six-month Notice Period. Nordic placed Mr. Distefano on "Garden Leave" pursuant to section 5(f)(ii) of the Employment Agreement.

**ANSWER:** Admitted.

67.    On March 7, 2022, Mr. Distefano and Mr. Costanzo met in person in Miami, which was their first meeting after Mr. Distefano had resigned from his advisory consulting role as a Nordic employee.

**ANSWER:**    Defendant admits that Mr. Costanzo and Mr. Distefano met in Miami.  Defendant

is without sufficient information or belief regarding the exact dates of the meeting, and therefore

denies the allegations in this paragraph regarding such dates.  Defendant denies any remaining

allegations in this paragraph.

68.    They discussed the Software Platform, also known as Wellward, and Mr. Costanzo responded "you are Wellward, there is no Wellward without you. Nothing has changed."

**ANSWER:**    Denied.

69.    On March 15, 2022, at an industry trade show in Orlando, Mr. Costanzo told a group including Mr. Distefano, two Nordic executives and a prospective customer of the Software Platform, "John is the inventor of Wellward...he's the CEO of the company we'll create."

**ANSWER:**    Denied.

70.    On March 22, 2022, Mr. Distefano met with Mr. Sean Luecke of Blue Cross Blue Shield of Florida, a prospective customer, in Jacksonville, Florida. Accompanying Mr. Distefano in that meeting was Nordic Managing Director, Mr. Wally Ward. During introductions of the meeting, Mr. Ward introduced Mr. Distefano as the "champion and leader of Wellward."

**ANSWER:**    Denied.

71.    On April 4, 2022, Mr. Costanzo sent Mr. Distefano an MS Teams message saying he is "very excited" about the investor discussions Mr. Distefano had been having over the last several weeks with potential companies to invest in the Software Platform.

**ANSWER:**    Defendant admits that Mr. Distefano represented that third parties were interested

in potentially investing in the Software Platform.  Defendant admits that Mr. Costanzo and Nordic

were excited about the potential for the Software Platform based on these representations by Mr.

Distefano.  Defendant denies any remaining allegations in this paragraph.

72.    On April 5, 2022. Mr. Distefano and Mr. Costanzo met via MS Teams to discuss the various investor meetings conducted by Mr. Distefano, which included a private equity firm, a healthcare technology company, and major healthcare organizations. Mr. Costanzo once again expressed his positive support and assured Mr. Distefano "nothing has changed" regarding the planned spin-out of the new jointly owned company for the Software Platform.

**ANSWER:** Defendant admits that Mr. Costanzo and Mr. Distefano occasionally met via MS Teams. Defendant is without sufficient information or belief regarding the exact dates of the meetings, and therefore denies the allegations in this paragraph regarding such dates. Defendant admits that Mr. Distefano represented third party interest in potentially investing in the Software Platform. Defendant admits that Mr. Costanzo and Nordic expressed positive support about the potential for the Software Platform based on these representations by Mr. Distefano. Defendant denies any remaining allegations in this paragraph.

73.    On April 7, 2022, Mr. Distefano sent Mr. Costanzo an email stating " ...word is you may have a buyer [for Nordic]...let's be sure to find time to...talk through the next steps on the legal aspects of my Wellward IP ownership so we can avoid any surprises there."

**ANSWER:** Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the email. Defendant denies that Mr. Distefano had any ownership of any Wellward IP developed using Nordic resources.

74.    On May 11, 2022, Mr. Distefano and Mr. Costanzo met in Madison, Wisconsin to discuss Mr. Distefano's ownership of the Software Platform as the sale of Nordic approached. Mr. Costanzo assured Mr. Distefano, "I am not stealing your IP, Nordic is not going to steal your IP."

**ANSWER:** Defendant admits that Mr. Costanzo and Mr. Distefano met in Madison, Wisconsin. Defendant is without sufficient information or belief regarding the exact date of the meeting, and therefore denies the allegations in this paragraph regarding such date. Defendant denies that Mr. Distefano had any ownership of any portions of the Software Platform developed using Nordic resources. Defendant denies any remaining allegations in this paragraph.

75.    Mr. Costanzo represented that Nordic was not claiming ownership of the Software Platform and that Nordic was not the owner of the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to the Software Platform that had been developed or created.

**ANSWER:** Denied.

76.     Mr. Distefano and Mr. Costanzo also discussed the Operating Agreement that was being prepared for the new jointly owned company and Mr. Costanzo responded and reiterated that "[you] will lead the new company."

**ANSWER:**     Denied.

E.     Formation of Jointly Owned Company

June, 2022

77.     Mr. Distefano continued to control and direct the overall development of the body of software code at issue here on his own time after being reassured by Mr. Costanzo.

**ANSWER:**     Denied.

78.     In addition, Mr. Distefano turned his attention to the formation of the jointly owned company that would monetize the Software Platform.

**ANSWER:**     Defendant denies that Nordic ever agreed to form a jointly owned company with Mr. Distefano to monetize the Software Platform. Defendant is without sufficient information or belief regarding the remaining allegations in this paragraph and therefore denies them.

79.     On May 12, 2022, counsel for Mr. Distefano sent a letter to Mr. Costanzo to initiate a discussion about Mr. Distefano's intellectual property rights in the Software Platform and how it would be authorized for use by the new company.

**ANSWER:**     Defendant admits that Mr. Distefano's counsel sent Nordic a letter addressed to Mr. Costanzo.  Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the letter.  Defendant denies that Mr. Distefano had any intellectual property rights in the Software Platform or that Nordic ever agreed to form a jointly owned company with Mr. Distefano involving the Software Platform.

80.     In particular, the letter states, "[o]ur Client notes that his Intellectual Property serves as the foundation for the Company's [Software] Platform, and forms the basis upon which the [Software] Platform's concepts, materials, ideas, programs, and Reusable Concepts and Proprietary Programs have been built, and accordingly our Client shall maintain ownership."

**ANSWER:**   Defendant admits that Mr. Distefano's counsel sent Nordic a letter addressed to Mr. Costanzo.   Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the letter.

81.    It is clear from the May 12, 2022, letter that Mr. Distefano was claiming full ownership of everything related to the Software Platform and wanted to make sure everyone was on the same page.

**ANSWER:**   Defendant admits that Mr. Distefano's counsel sent Nordic a letter addressed to Mr. Costanzo.   Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the letter.   Defendant denies that Mr. Distefano had any ownership rights in any portion of the Software Platform created using Nordic resources.

82.    On May 16, 2022, Nordic's Senior Vice President and Head of Human Resources emailed Mr. Distefano confirming, "I also received the letter from the patent attorney. Thanks for the heads up on that one. Irina [Brault, in-house counsel] will run point on this matter."

**ANSWER:**   Defendant states that the email is a document that speaks for itself.   Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the email.

83.    Subsequently, on June 1, 2022, the acquisition of Nordic by Accrete Health Partners ("Accrete") and parent company Bons Secours Mercy Health was completed.

**ANSWER:**   Admitted.

84.    Also, on June 1, 2022, a second letter from counsel for Mr. Distefano was sent to Mr. Costanzo again clearly claiming ownership of the Software Platform.

**ANSWER:**   Defendant admits that Mr. Distefano's counsel sent Nordic a letter addressed to Mr. Costanzo.   Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the letter.   Defendant denies that Mr. Distefano had any ownership rights in any portion of the Software Platform created using Nordic resources.

85.    In particular, the letter stated with respect to forming the new jointly owned company that "[a]ll intellectual property associated with the Wellward project, including that owned by Mr. Distefano ... would be assigned to the new entity." Mr. Costanzo and Ms. Brault had a duty to dispute Mr. Distefano's claims to ownership to the Software Platform and let him know if they believed otherwise. However, they did not dispute Mr. Distefano's claims of

ownership to the Software Platform and all representations and actions by Nordic, and omissions, confirmed Mr. Distefano was the owner.

**ANSWER:**    Defendant admits that Mr. Distefano's counsel sent Nordic a letter addressed to Mr. Costanzo.  Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the letter.  Defendant denies that Mr. Distefano had any ownership rights in any portion of the Software Platform created using Nordic resources.  Defendant denies that it did not dispute Mr. Distefano's claims of ownership to the Software Platform.  Defendant denies that it had any duty to notify Mr. Distefano that Nordic disputed Mr. Distefano's claim of ownership to the Software Platform.  Defendant denies that all representations and actions by Nordic, and omissions, confirmed Mr. Distefano was the owner.  Defendant denies any remaining allegations in this paragraph.

86.    On June 20, 2022, Mr. Distefano emailed an Operating Agreement for the jointly owned company to both Mr. Costanzo and Ms. Brault who is in-house counsel for Nordic. The Operating Agreement is attached hereto as Exhibit E.

**ANSWER:**    Defendant admits that Mr. Distefano emailed a proposed Operating Agreement to Mr. Costanzo and Ms. Brault on or around June 20, 2022.  Defendant admits that Ms. Brault was Nordic's in-house counsel.  Defendant denies that Nordic ever agreed to form a jointly owned company with Mr. Distefano.  Defendant denies any remaining allegations in this paragraph.

87.    The email and Operating Agreement stated in pertinent part that Mr. Distefano would be named Manager and granted an initial 22% ownership in the new jointly owned company.

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the email or the proposed Operating Agreement.  Defendant denies that Nordic ever agreed to the proposed Operating Agreement.  Defendant denies that Nordic ever established or granted Mr. Distefano any ownership in a jointly owned company.  Defendant denies any remaining allegations in this paragraph.

88.     Neither Mr. Costanzo nor Ms. Brault, or any representative of Nordic for that matter, objected to the terms of the Operating Agreement or disputed that Mr. Distefano was the owner of the Software Platform, including the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to the Software Platform.

**ANSWER:**     Denied.

89.     On June 27, 2022, Mr. Distefano and Mr. Costanzo met via MS Teams to review the Operating Agreement. Mr. Costanzo reaffirmed that "nothing has changed" regarding Mr. Distefano's role to run the new jointly owned company. Mr. Distefano pointed out his percentage of ownership of the new company and Mr. Costanzo responded that it "looks good" and agreed to the operating principles and ownership structure of the new jointly owned company.

**ANSWER:**     Denied.

90.     After that meeting on June 27, 2022, Mr. Costanzo took personal time off due to the recent acquisition of Nordic and things would start moving again on his return.

**ANSWER:**     Defendant admits that Mr. Costanzo took personal time off starting around June 2022, after the acquisition of Nordic.   Defendant denies any remaining allegations in this paragraph.

91.     In the meantime, Mr. Distefano met individually in July, 2022, with persons named in the Operating Agreement as Members to discuss their membership interest, capital contribution expectations, and voting rights in the new jointly owned company. This included Kevin Erdal, Scott Rossignol, Donald Gravlin, and Dianna (Dee) Selgrath.

**ANSWER:**     Defendant is without sufficient information or belief regarding the remaining allegations in this paragraph and therefore denies them.

F.     The Second Statement of Work

August 22, 2022 - January 31, 2023

92.     Mr. Distefano and Mr. Costanzo met in Madison, Wisconsin on August 16, 2022, to discuss ownership of the Software Platform and forming the new company after Mr. Costanzo had returned from his personal time off in July, 2022.

**ANSWER:**     Defendant admits that Mr. Costanzo returned from his personal time off in or around July 2022.   Defendant admits that Mr. Costanzo and Mr. Distefano met in Madison, Wisconsin.   Defendant is without sufficient information or belief regarding the exact date of the

meeting, and therefore denies the allegations in this paragraph regarding such date. Defendant denies that Mr. Distefano had any ownership of any portions of the Software Platform developed using Nordic resources. Defendant denies any remaining allegations in this paragraph.

93.    Mr. Costanzo confirmed and represented during this meeting that he had the sole authority to form the new spin-out jointly owned company and he did not need permission from anyone.

**ANSWER:**    Denied.

94.    Mr. Costanzo stated "once the dust settles from the acquisition we can make the spin off happen by the end of the year."

**ANSWER:**    Denied.

95.    Mr. Costanzo then proceeded to ask Mr. Distefano, "can I hire you back?"

**ANSWER:**    Denied.

96.    Mr. Distefano's Garden Leave under the Employment Agreement was scheduled to end August 21, 2022, and the Software Platform was expected to be fully operational at the end of the 2022. This is when Mr. Costanzo represented that the new jointly owned company would be formed to monetize the Software Platform with Mr. Distefano as Manager.

**ANSWER:**    Defendant admits that Mr. Distefano's Garden Leave under the Employment Agreement was scheduled to end on or around August 21, 2022. Defendant denies the remaining allegations in this paragraph.

97.    Mr. Costanzo and Ms. Brault never disputed Mr. Distefano's open and obvious claims to ownership of the Software Platform, the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, derivative works of the foregoing, and other materials related to the Software Platform, and forming a jointly owned company as explained above.

**ANSWER:**    Denied.

98.    Thus, it appeared that things were moving forward as agreed and there was no reason to question the representations of Mr. Costanzo and Ms. Brault at that time. However, Mr. Distefano was not interested in being an employee of Nordic.

**ANSWER:**    Denied.

99.    Instead, goDesk executed a Second Statement of Work. The Second Statement of Work is attached hereto as Exhibit F.

**ANSWER:**    Defendant admits that Mr. Distefano executed a Second Statement of Work ("Second SOW") attached as Exhibit F on behalf of goDesk.

100.    Mr. Distefano on behalf of goDesk would not have executed the Second Statement of Work had Mr. Costanzo or Ms. Brault disputed the statements in the June 2022 letters from Mr. Distefano's counsel about claims of ownership of the Software Platform, which included the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to the Software Platform, and forming a jointly owned company as explained above.

**ANSWER:**    Denied.

101.    However, neither Mr. Costanzo nor Ms. Brault disputed the claims of Mr. Distefano as to ownership of the Software Platform, the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to the Software Platform, and are estopped from asserting otherwise once Mr. Distefano executed the Second Statement of Work.

**ANSWER:**    Denied.

102.    Quite the opposite of disputing Mr. Distefano's assertions of ownership of the Software Platform, Mr. Costanzo affirmed the original agreement from April 1, 2020, or otherwise made another oral agreement on June 27, 2022, on behalf of Nordic to form the jointly owned company with Mr. Distefano pursuant to the terms of the Operating Agreement to monetize the Software Platform.

**ANSWER:**    Denied.

103.    The Second Statement of Work, similar to the First Statement of Work was between Nordic and goDesk. There was no intention that goDesk would be part of the new jointly owned company, only Mr. Distefano, so the fact that there was no description about the new jointly owned company in the Second Statement of Work did not raise any red flags to Mr. Distefano.

**ANSWER:**    Denied.

104.    Unbeknownst to Mr. Distefano at the time, Mr. Costanzo and Ms. Brault had conspired to make a number of false representations that induced Mr. Distefano to execute the Second Statement of Work in an attempt to wrestle away valuable intellectual property rights.

**ANSWER:**    Denied.

105.    One false representation made by Mr. Costanzo was that as CEO of Nordic he had the authority to form a new jointly owned company with Mr. Distefano to monetize the Software

Platform. We know now that he did not have the authority and he knew he did not have the authority, but nonetheless he recklessly, intentionally and maliciously made false representations to Mr. Distefano anyways. Mr. Costanzo knew Mr. Distefano was relying on his false representations to execute the Second Statement of Work.

**ANSWER:**    Denied.

106.    Mr. Costanzo even stated during the August 16, 2022, meeting in Madison, Wisconsin, "I can't tell you how much I appreciate you sticking with me on this.... Wellward is the culmination of your career, that's got to feel pretty cool."

**ANSWER:**    Denied.

107.    The Second Statement of Work had a start date of August 22, 2022, and end date of December 31, 2022. The Second Statement of Work also provided that "[t]he terms of this agreement will automatically renew at the end of each term for a further term of one months unless either party gives the other written notice of termination at least 5 days prior to the end of the relevant term."

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is

inconsistent with the Second SOW.

108.    Thus, the term of the Second Statement of Work and the renewal being month to month suggested to Mr. Distefano that the jointly owned company was going to be formed in only a few months and pursuant to the terms of the Operating Agreement.

**ANSWER:**    Denied.

109.    But in reality, Mr. Costanzo and Ms. Brault already knew that was not going to happen because Mr. Costanzo did not have the authority, which was unknown to Mr. Distefano. Mr. Costanzo also had no intention to even seek permission from Accrete and its parent company Bons Secours Mercy Health (BSMH), who were the new owners of Nordic, before Mr. Distefano executed the Second Statement of Work even though he knew Mr. Distefano was relying on his false representations and that Mr. Distefano was out marketing the Software Platform and making preparations for the new jointly owned company.

**ANSWER:**    Defendant denies that Mr. Costanzo or Ms. Brault made any false representations

to Mr. Distefano.  Defendant is without sufficient information or belief regarding Mr. Distefano's

state of mind and therefore denies all such allegations.  Defendant denies the remaining allegations

in this paragraph.

110.    This is evidenced by an email from Mr. Costanzo dated September 26, 2023, attached hereto as Exhibit G, for the first time he admits to Mr. Distefano that he in fact does not

have authority to form a jointly owned company, and that he would need approval from Accrete and its parent company Bons Secours Mercy Health (BSMH). It is unlikely that he even tried to obtain approval.

**ANSWER:**    Defendant states that the email is a document that speak for itself.  Defendant denies

any allegations in this paragraph to the extent such allegation is inconsistent with such email.

Defendant denies any remaining allegations in this paragraph.

111.    Ms. Brault conspired with Mr. Costanzo to have Mr. Distefano execute the Second Statement of Work in an attempt to avoid litigation that would have been initiated had Mr. Costanzo or she disputed Mr. Distefano's claims to ownership of the Software Platform, the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to the Software Platform back in June 2022.

**ANSWER:**    Denied.

112.    The malicious intent of Mr. Costanzo and Ms. Brault to offer the Second Statement of Work to Mr. Distefano, which specifically included the Software Platform as part of the Services, was an attempt to have Mr. Distefano unknowingly assign his intellectual property rights to the Software Platform and software code to Nordic in an attempt to unlawfully deprive Mr. Distefano of his valuable intellectual property and due compensation.

**ANSWER:**    Denied.

113.    Accordingly, Mr. Distefano was fraudulently induced to execute the Second Statement of work on behalf of goDesk in August 2022, in anticipation of, and based on, the conduct and fraudulent representations of Mr. Costanzo that the new company jointly owned company would be formed by the end of the year pursuant to the terms of the Operating Agreement to monetize Mr. Distefano's software platform now known as Wellward.

**ANSWER:**    Denied.

114.    Fraudulent representations made by Mr. Costanzo included that the Second Statement of Work was part of the initial process of preparing for the new jointly owned company to monetize Mr. Distefano's Software Platform, which was not true.

**ANSWER:**    Denied.

115.    The Second Statement of Work stated that goDesk was to "provide consulting services related to the platform development and commercialization efforts of the [software] platform," which was consistent with Mr. Costanzo's representations that would lead to forming the new jointly owned company to launch Mr. Distefano's software platform, but also was not true.

**ANSWER:**    Defendant admits that the Second SOW includes the provision reproduced in this paragraph.  Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the Second SOW.  Defendant denies the remaining allegations in this paragraph.

116.    In preparation for being the Manager of the impending jointly owned company, Mr. Distefano personally acquired the Internet domain name WellwardDigital.com in September, 2022. Mr. Distefano worked extensively with Nordic's Marketing leadership, Nordic's IT leadership and Nordic's external advertising firm to define the brand guidelines for the separate Wellward entity, and to design and build the Wellward website in anticipation of the spin out of the new jointly owned company.

**ANSWER:**    Defendant admits that Mr. Distefano acquired the Internet domain name WellwardDigital.com.  Defendant denies that such acquisition was in preparation for being the Manager of any jointly owned company.  Defendant admits that, as part of his work under the MSA, the First SOW, the Second SOW, and/or the Employment Agreement, Mr. Distefano worked with Nordic's marketing department, IT department, and Nordic's outside advertising firm to help design and build the Wellward website for Nordic.  Defendant denies any remaining allegations in this paragraph.

117.    In addition, Mr. Distefano continued preparations for the impending new jointly owned company by meeting with potential investors. In an email on October 19, 2022, Mr. Distefano informed Mr. Costanzo of the urgency to finalize timing of the spin out. Mr. Distefano stated, "[t]iming is getting more important as I've met recently with Jared Short, CEO of Cambia and we meet again the first week in November."

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with the alleged email.  Defendant denies any remaining allegations in this paragraph.

118.    On October 20, 2022, Mr. Costanzo and Mr. Distefano met under the meeting subject "Wellward for Investors." Mr. Costanzo reaffirmed the plan and told Mr. Distefano there is "no change in my mind" about the spin off of a jointly owned company.

**ANSWER:**    Defendant admits that Mr. Costanzo and Mr. Distefano met to discuss potential investment in Wellward.  Defendant is without sufficient information or belief regarding the exact date of the meeting, and therefore denies the allegations in this paragraph regarding such date.

Defendant denies that Nordic ever agreed to form a jointly owned company with Mr. Distefano.

Defendant denies any remaining allegations in this paragraph.

119.    Accordingly, Mr. Distefano conducted additional meetings on October 25, 2022, November 15, 2022, and November 21, 2022 with potential investors and strategic partners including PwC.

**ANSWER:**    Defendant is without sufficient information or belief regarding the allegations in

this paragraph and therefore denies them.

120.    Despite the promises and agreement of Mr. Costanzo on behalf of Nordic to form a new jointly owned company by the end of the year to monetize Mr. Distefano's Software Platform, Nordic failed to do so.

**ANSWER:**    Defendant admits that the parties never formed a jointly owned company.

Defendant denies that Nordic ever agreed to form a jointly owned company with Mr. Distefano.

Defendant denies that Mr. Distefano had any ownership of any portions of the Software Platform

developed using Nordic resources.  Defendant denies any remaining allegations in this paragraph.

121.    In addition, Mr. Costanzo sent an email on January 3, 2023, stating that "Nordic will stop further investment in developing the Wellward platform. We will shift our focus to selling Wellward in the market.... As our focus turns to sales, we need to redefine your relationship with Nordic. It is my hope that you will stay involved from a sales perspective, and I would like you to consider a 'finder's fee' or commission-based arrangement with Nordic for any clients you help us sell...."

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is

inconsistent with such email.  Defendant denies any remaining allegations in this paragraph.

122.    A follow-up January 18, 2023, email stated that Nordic's "decision is to not put an additional agreement in place at this time... and therefore the current end date of your contract will close out the contractual relationship at this point."

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is

inconsistent with such email.  Defendant denies any remaining allegations in this paragraph.

123.    Unclear as to whether Nordic was attempting to steal his Software Platform and related intellectual property, Mr. Distefano followed up to inquire as to whether there was any objection to him taking his Software Platform (i.e., Wellward) to a third party so that he could monetize it.

**ANSWER:**    Defendant denies that Mr. Distefano had any ownership of any portions of the Software Platform developed using Nordic resources.  Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with such email.  Defendant denies any remaining allegations in this paragraph.

124.    Nordic's in-house counsel, Ms. Brault, responded within forty-eight hours via email on January 26, 2023, claiming Nordic owned the intellectual property, and stated:

> I just want to ensure we are on the same page: all the code, applications (e.g., Connector), schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to [Mr. Distefano's software platform] have been developed by Nordic resources (its employees and independent contractors) and belong to Nordic (it is Nordic's IP that can be used only by Nordic). Also, Nordic owns the rights to the federally registered mark in Wellward.

> As for the idea/concept of a digital platform, you are free to pursue it (alone or with other partners), subject to you complying with your confidentiality and other obligations (e.g., not using Nordic's IP) that are outlined in your agreements with Nordic.

> Let me know if you have any questions. I wish you all the best on your journey!

**ANSWER:**    Defendant denies any allegations in this paragraph to the extent such allegation is inconsistent with such email.  Defendant denies any remaining allegations in this paragraph.

125.    Of course had Ms. Brault been forthcoming so quickly a few months earlier as to Nordic's position on Mr. Distefano's ownership of the Software Platform, Mr. Distefano would not have executed the Second Statement of Work.  The conspiracy and malicious intent of Nordic to steal Mr. Distefano's Software Platform, intellectual property, and other related materials was now made crystal clear.

**ANSWER:**    Denied.

126.    As explained above, there was an original oral agreement on April 1, 2020, and a subsequent affirmation or new oral agreement on August 16, 2022 for Mr. Distefano to control and direct the overall development of the body of software code at issue here based on the concepts, materials, ideas and other intellectual property of Mr. Distefano.

**ANSWER:**    Denied.

127.    Mr. Distefano performed his obligations under the oral agreement(s) but Mr. Distefano has not been fully compensated for his intellectual property which is embodied by the Wellward Software Platform and estimated to be able to generate tens of millions of dollars in revenue and hundreds of millions in enterprise value.

**ANSWER:**    Denied.

128.    In addition, Mr. Distefano managed, supervised, controlled and directed the overall development of the body of software code to write the code for his software platform, which he has never been fully compensated and for which he is at least a joint author and owner under U.S. Copyright laws.

**ANSWER:**    Denied.

129.    Nordic failed to perform their contractual obligations by not forming a new jointly owned company to monetize Mr. Distefano's software platform, and preventing Mr. Distefano from doing so, and have breached the various written agreements by asserting sole ownership of "all the code, applications..., schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to [Mr. Distefano's software platform]".

**ANSWER:**    Denied.

130.    Moreover, Mr. Distefano could have hired software programmers from any number of sources to write the code for his software platform, but chose to use Nordic based on the terms of the oral agreement upon which Mr. Distefano reasonably relied, and the various written agreements and representations made by Mr. Costanzo.

**ANSWER:**    Defendant is without sufficient information or belief regarding Mr. Distefano's

state of mind and therefore denies any such allegations. Defendant denies that the parties ever

entered an oral agreement. Defendant denies any remaining allegations in this paragraph.

131.    Had Mr. Distefano known that Nordic would claim sole ownership of the software code and other materials related to his Software Platform, he never would have agreed to have Nordic involved in any way with his software platform. Mr. Distefano's intellectual property and services related to the Software Platform were not, and never intended, to be a "gift" to Nordic.

**ANSWER:**    Denied.

132.    There was never any assignment of any ownership rights to Nordic of Mr. Distefano's concepts, ideas, and copyrighted materials that are inextricably intertwined with the code and other materials related to the Software Platform. Nordic has no ownership rights to license, assign, sell, or transfer the code and other materials for the Software Platform to anyone as they were never Contract Property or Company Works.

**ANSWER:**    Denied.

133. The Software Platform belongs to Mr. Distefano including all the software code, applications, schematics, flowcharts, presentations, slides, sales and marketing materials, derivative works of the foregoing, and other materials related to his Software Platform because Mr. Distefano is the author or joint author and it is his intellectual property. Moreover, Mr. Distefano is entitled to at least an undivided right to the code of the Software Platform under applicable Copyright laws as a joint author under 17 U.S.C. 101, 201(a).

**ANSWER:**    Denied.

134. Now, because Nordic is unlawfully claiming sole ownership of those materials including the software code and deprived access to the Software Platform, Mr. Distefano was not able to license or sell the Software Platform to those customers that were waiting for the Software Platform to be operational.

**ANSWER:**    Denied.

135. This has resulted in substantial lost business and licensing opportunities and damage to his reputation. In addition, Mr. Distefano is entitled to profits generated from the Software Platform by Nordic since he is considered at least a joint author as he controlled and directed the overall development of the body of software code at issue here, and his additional substantial and valuable contributions were merged with Nordic's contributions (if any) into inseparable or interdependent parts of a unitary work now known as Wellward.

**ANSWER:**    Denied.

## <u>COUNT I - DISTEFANO</u><br><u>(Breach of Oral Contract)</u>

136. This is an action against Nordic for breach of an oral contract.

**ANSWER:**    Defendant admits that this purports to be an action against Nordic for a breach of

an alleged oral contract.  Defendant denies the existence of any such oral contract.

137. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs

1 through 135 above as though they were fully set forth herein.

138. The parties entered an oral contract during a meeting on April 1, 2020, through the offer of Mr. Distefano to bring his vision, conceptual design, functional design, business requirements, ideas, and other intellectual property of his Software platform to Nordic if Nordic would provide its software programmers. Mr. Distefano agreed to control the Nordic software programmers and direct the overall development of the body of software code at issue here, and his contributions would be merged with Nordic's contributions (if any) into inseparable or

interdependent parts of a unitary work. In addition, the parties agreed that Nordic and Mr. Distefano would form a jointly owned company that would monetize the Software Platform. Mr. Costanzo as CEO of Nordic verbally accepted Mr. Distefano's offer on April 1, 2020, and the contract was formed.

**ANSWER:**    Denied.

139.    The oral contract was not formalized due to the parties responding to pressing needs of the business and because the terms and conditions were already solidified in the parties' minds and contract performance was being completed without any disputes.

**ANSWER:**    Denied.

140.    Nevertheless, the oral contract was evidenced and confirmed by written correspondence between the parties and others, telephone conversations, no less than thirteen in-person and virtual meetings, performance of the contract, the Operating Agreement, and the parties' course of conduct.

**ANSWER:**    Denied.

141.    As explained above, under the terms of the oral contract, Nordic agreed to form a jointly owned company to monetize Mr. Distefano's Software Platform and that was a material term that induced Mr. Distefano to partner with Nordic.

**ANSWER:**    Denied.

142.    On June 27, 2022, the oral contract was affirmed, or a new second oral contract was otherwise formed on August 16, 2022. Material terms of the oral contract are stated in the Operating Agreement.

**ANSWER:**    Denied.

143.    Nordic breached the oral contract by failing to form a jointly owned company with Mr. Distefano and instead claimed sole ownership of his Software Platform, vision, conceptual design, functional design, business requirements, schematics, flowcharts, presentations, slides, sales and marketing materials, derivative works of the foregoing, and other materials related to the Software Platform that he is an author or joint author.

**ANSWER:**    Denied.

144.    Nordic has also breached the oral contract by failing to form the jointly owned company to monetize the Software Platform with Mr. Distefano, and by preventing Mr. Distefano from monetizing his Software Platform in any manner.

**ANSWER:**    Denied.

145.     As a direct and proximate result of Nordic's breaches of the oral contract, Plaintiff has been damaged in the nature of not receiving compensation for his intellectual property and services in building the Software Platform, damage to his reputation, and loss of business opportunities.

**ANSWER:**     Denied.

146.     WHEREFORE, Plaintiff Distefano is entitled to, and demands an award of compensatory damages, consequential damages, prejudgment interest, post judgment interest, court costs, and any further relief this Court deems just and proper.

**ANSWER:**     Denied.

## COUNT II - DISTEFANO
## (Breach of Implied Contract)

147.     This is an action, in the alternative to Count I for breach of an oral contract, against Nordic for breach of an implied contract.

**ANSWER:**     Defendant admits that this purports to be an action, in the alternative, against Nordic

for breach of an implied contract. Defendant denies the existence of any such implied contract.

148.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**     Defendant repeats, restates, and incorporates by reference its answers to paragraphs

1 through 135 above as though they were fully set forth herein.

149.     A contract was formed between Plaintiff Distefano and Nordic based on their conduct. The respective conduct of the Parties proves assent to form a jointly owned company to monetize Mr. Distefano's Software Platform, have Mr. Distefano control the Nordic software programmers and direct the overall development of the body of software code at issue here, and merge Mr. Distefano's contributions of his vision, conceptual design, functional design, business requirements with Nordic's contributions (if any) into inseparable or interdependent parts of a unitary work.

**ANSWER:**     Denied.

150.     As explained above, Mr. Distefano controlled the Nordic software programmers and directed the overall development of the body of software code using his intellectual property.

**ANSWER:**     Denied.

151.    In June 2022, Mr. Distefano provided an Operating Agreement for a new company that would be jointly owned by him individually and Nordic because his Software Platform was close to being operational.

**ANSWER:**    Denied.

152.    Written correspondence between the parties and others, telephone conversations, and in-person meetings suggest a contract was formed to jointly monetize Mr. Distefano's Software Platform.

**ANSWER:**    Denied.

153.    Thus, a contract was formed that can be inferred in whole or in part from the Parties' conduct as described above as a benefit of Mr. Distefano's intellectual property of the Software Platform was conferred on Nordic, Nordic acknowledged or appreciated the benefit of Mr. Distefano's intellectual property, and under such circumstances it would be unfair for Nordic to retain it without paying the value thereof.

**ANSWER:**    Denied.

154.    Nordic breached the implied contract by failing to form a jointly owned company with Mr. Distefano and instead claimed sole ownership of his Software Platform, schematics, flowcharts, presentations, slides, sales and marketing materials, derivative works of the foregoing, and other materials related to the Software Platform that he is an author or joint author. Nordic has also breached the implied contract by failing to monetize the Software Platform and preventing Mr. Distefano from doing so by denying him access to the Software Platform.

**ANSWER:**    Denied.

155.    As a direct and proximate result of Nordic's breach of the implied contract, Plaintiff has been damaged in the nature of not receiving reasonable compensation for his intellectual property and services in building the Software Platform, and loss of business opportunities.

**ANSWER:**    Denied.

156.    WHEREFORE, Plaintiff Distefano is entitled to, and demands an award of compensatory damages, consequential damages, prejudgment interest, post judgment interest, court costs, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

## COUNT III - DISTEFANO
### (Unjust Enrichment)

157.    This is an action against the Defendant for unjust enrichment, in the alternative to Counts I and II for breach of oral contract and implied contact, respectively.

**ANSWER:**    Defendant admits that this purports to be an action, in the alternative to Counts I and II, against Nordic for unjust enrichment.

158.    Plaintiff Distefano re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs 1 through 135 above as though they were fully set forth herein.

159.    The Plaintiff Distefano conferred a benefit on Nordic by providing his vision, conceptual design, functional design, business requirements, concepts, materials, ideas, and other intellectual property for the Software Platform. Nordic also received the benefit of Plaintiff Distefano controlling the Nordic software programmers and directing the overall development of the body of software code using his substantial and valuable intellectual property that he is an author or joint author. In addition, Plaintiff Distefano created schematics, flowcharts, presentations, slides, sales and marketing materials, derivative works of the foregoing, and other materials related to the Software Platform that he is an author and that Nordic received the benefit. Nordic has also received a benefit through monetizing the Software Platform, in whole or in part, for itself, and denying Mr. Distefano from doing so by denying him access to the Software Platform.

**ANSWER:**    Denied.

160.    Nordic had knowledge of the benefits being conferred on it by Plaintiff Distefano.

**ANSWER:**    Denied.

161.    Nordic has retained those benefits, and the circumstances are such that it would be inequitable for Nordic to retain the benefits of the Plaintiff Distefano's services, his intellectual property, and to monetize the Software Platform, in whole or in part, for itself without paying fair value for it.

**ANSWER:**    Denied.

162.    WHEREFORE, Plaintiff is entitled to, and demands an award of compensatory damages, prejudgment interest, post judgment interest, court costs, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

**COUNT IV – DISTEFANO**
**Declaration of Copyright Interests**

163.    This is an action against Nordic for a Declaration of Copyright Interests arising out of Mr. Distefano's authorship of materials related to the Software Platform, and joint authorship of the code for the Software Platform.

**ANSWER:**    Defendant admits that this purports to be an action against Nordic for a Declaration of Copyright Interests arising out of Mr. Distefano's alleged ownership of materials allegedly related to the Software Platform, and alleged joint authorship of the code for the Software Platform.

164.    Plaintiff Distefano re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs 1 through 135 above as though they were fully set forth herein.

165.    As explained above, Mr. Distefano was the architect that controlled the Nordic software programmers and directed the overall development of the body of software code using his vision, conceptual design, functional design, and business requirements for the Software Platform.

**ANSWER:**    Denied.

166.    Among other things, he designed the flow of the Software Platform, and established communication and coordination among the various functions so that it would operate as a successful and useful commercial product that could be monetized.

**ANSWER:**    Denied.

167.    Mr. Distefano's and Nordic's intentions were that Mr. Distefano's significant and valuable contributions of the Software Platform and his direction and control of the Nordic software programmers would merge into the final software design and system as a joint work under 17 U.S.C. §§ 101, 201(a).

**ANSWER:**    Denied.

168.    Thus, Plaintiff Distefano seeks a declaration that he is a joint author of all schematics, flowcharts, presentations, slides, sales and marketing materials, derivative works thereof, and other materials related to the Software Platform that he created.

**ANSWER:**    Denied.

169.    Mr. Distefano also seeks a declaration that he is a joint author and that the code for the Software Platform now known as Wellward is a joint work, and that he has the independent right to use or license the copyright subject only to a duty to account for any profits that he earns from the licensing or use of the copyright.

**ANSWER:**    Denied.

170.    WHEREFORE, Plaintiff Distefano is entitled to, and demands a declaration that he is the sole author and owner of materials he created related to the Software Platform pursuant to 17 U.S.C. § 101, and that he is a joint author of the code for the Software Platform pursuant to 17 U.S.C. §§ 101, 102(a), and that he be provided the code for the Software Platform, and an award of compensatory damages, prejudgment interest, court costs, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

## COUNT V - DISTEFANO
## (Breach of Written Agreement)

171.    This is an action by Plaintiff Distefano against Nordic for breach of a written contract.

**ANSWER:**    Defendant admits that this purports to be an action by Plaintiff against Defendant for an alleged breach of a written contract.

172.    Plaintiff Distefano re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs 1 through 135 above as though they were fully set forth herein.

173.    The Plaintiff Distefano executed an Employment Agreement with an effective date of December 1, 2021.

**ANSWER:**    Admitted.

174.    The Employment Agreement provided in pertinent part that, "the definition of Company Works does not include any ... any concepts, materials, ideas, or other intellectual property previously developed by Employee."

**ANSWER:**    Admitted.

175.    Nordic breached the Employment Agreement on January 26, 2023, by claiming sole ownership of materials that were previously developed by Mr. Distefano, and derivative works thereof.

**ANSWER:**    Denied.

176.    The Employment Agreement also provides that "the definition of Company Works does not include any works of authorship, inventions, intellectual property, materials, documents or other work product developed (alone or jointly) by the Employee (i) entirely on the Employee's own time."

**ANSWER:**    Admitted.

177.    Nordic breached the Employment Agreement on January 26, 2023, by claiming sole ownership of materials that were developed entirely on Mr. Distefano's own time.

**ANSWER:**    Denied.

178.    WHEREFORE, Plaintiff Distefano is entitled to, and demands an award of compensatory damages, consequential damages, prejudgment interest, post judgment interest, court costs, attorneys' fees, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

## COUNT VI - DISTEFANO
### (Intentional Misrepresentation)

179.    This is an action by Plaintiff Distefano against Nordic for intentional misrepresentation.

**ANSWER:**    Defendant admits that this purports to be an action by Plaintiff against Nordic for alleged intentional misrepresentation. Defendant denies that it made any misrepresentations to Mr. Distefano.

180.    Plaintiff Distefano re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs 1 through 135 above as though they were fully set forth herein.

181.    Nordic had a duty to disclose to Mr. Distefano prior to entering the oral contract and executing the Employment Agreement, that in fact Nordic was partnering with Mr. Distefano only to monetize the Software Platform for itself and to claim sole ownership.

**ANSWER:**    Denied.

182.    Nordic had a duty to disclose to Mr. Distefano prior to the oral contract and him executing the Employment Agreement, that in fact Nordic was partnering with Mr. Distefano only

to monetize the Software Platform for itself and to claim sole ownership. Representations, promises, and omissions that were made by Mr. Costanzo and Nordic to Mr. Distefano were illusory, fraudulent, and in bad faith.

**ANSWER:**    Denied.

183.    Nordic knew that Mr. Distefano was entering the Employment Agreement based on mistakes as to the facts.

**ANSWER:**    Denied.

184.    The fact that Nordic was partnering with Mr. Distefano to monetize the Software Platform for itself and to claim sole ownership was peculiarly and exclusively within the knowledge of Nordic, and Mr. Distefano could not reasonably be expected to discover it.

**ANSWER:**    Denied.

185.    On account of the objective circumstances of Mr. Distefano sending two letters from his counsel claiming ownership of the Software Platform, an Operating Agreement for a jointly owned entity, proposing and Nordic accepting changes to the draft Employment Agreement to exclude from Company Works all previously developed concepts, materials, ideas, and other intellectual property, and also excluding all works of authorship, inventions, intellectual property, materials, documents and other work product developed on his own time, Mr. Distefano would reasonably expect disclosure of the fact that Nordic was partnering with Mr. Distefano only to monetize the Software Platform for itself and in fact was claiming sole ownership.

**ANSWER:**    Denied.

186.    Nordic also had a duty to disclose that after the acquisition by Accrete it no longer even had authority to spin-out a jointly owned company with Mr. Distefano to monetize the Software Platform.

**ANSWER:**    Denied.

187.    Mr. Distefano would not have entered any agreements, oral or written, including the Employment Agreement, had he known that Nordic would attempt to use the terms of those agreements to claim sole ownership of the Software Platform, and sole ownership of all the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, derivative works thereof, and other materials related to the Software Platform.

**ANSWER:**    Denied.

188.    WHEREFORE, Plaintiff Distefano is entitled to, and demands equitable relief, and an award of compensatory damages, consequential damages, prejudgment interest, post judgment interest, attorneys' fees pursuant to the Employment Agreement, court costs, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

## COUNT VII - goDesk
### (Breach of Written Agreement)

189.    This is an action by Plaintiff goDesk against the Defendant for breach of a written contract.

**ANSWER:**    Defendant admits that this purports to be an action by Plaintiff goDesk against Defendant for an alleged breach of a written contract.

190.    Plaintiff goDesk re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs 1 through 135 above as though they were fully set forth herein.

191.    The Plaintiff goDesk executed a Master Services Agreement on May 11, 2020, for goDesk to provide the Services as described in a First Statement of Work.

**ANSWER:**    Admitted.

192.    The Master Services Agreement provided in pertinent part that "the Services use concepts, materials, ideas, or other intellectual property previously developed by Subcontractor (the 'Reusable Concepts') ... Subcontractor shall maintain ownership of the intellectual property rights in such Reusable Concepts and Proprietary Programs...."

**ANSWER:**    Admitted.

193.    Nordic breached the Master Services Agreement on January 26, 2023, by claiming sole ownership of intellectual property materials that were previously developed by Mr. Distefano.

**ANSWER:**    Denied.

194.    In addition, Nordic breached the First Statement of Work by claiming ownership of all the code, applications, schemas, flowcharts, presentations, slides, sales and marketing materials, derivative works of the foregoing, and other materials related to the Software Platform that were created by personnel of Plaintiff goDesk outside the scope of Services of the First Statement of Work.

**ANSWER:**    Denied.

195.    Nordic also breached the First Statement of Work by not paying all the fees owed. In particular, the First Statement of Work was renewed for a 6-month term that would end on

December 31, 2021. Nordic failed to pay the $25,000 per month fixed service fee and the $15,000 quarterly milestone incentives.

**ANSWER:**    Denied.

196.    Moreover, to the extent any materials of goDesk related to the Software Platform are considered Contract Property, Nordic has no license to even use the materials that comprise goDesk's and its personnel's "Reusable Concepts" because the license was contingent on Nordic paying all "fees and expenses required by this [First Statement of Work]," which it failed to do.

**ANSWER:**    Denied.

197.    WHEREFORE, Plaintiff goDesk is entitled to, and demands an award of compensatory damages, prejudgment interest, post judgment interest, court costs, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

## COUNT VIII - goDesk
## (Intentional Misrepresentation)

198.    This is an action by Plaintiff goDesk against Nordic for intentional misrepresentation.

**ANSWER:**    Defendant admits that this purports to be an action by Plaintiff goDesk against Nordic for alleged intentional misrepresentation. Defendant denies that it made any misrepresentations to goDesk or Mr. Distefano.

199.    Plaintiff goDesk re-alleges and incorporates the allegations contained in paragraphs 1 through 135 above, as if fully set forth herein.

**ANSWER:**    Defendant repeats, restates, and incorporates by reference its answers to paragraphs 1 through 135 above as though they were fully set forth herein.

200.    Nordic had a duty to disclose to goDesk prior to goDesk executing the MSA and First Statement of Work, that in fact Nordic was partnering with goDesk only to monetize the Software Platform of goDesk's personnel for itself and to claim sole ownership.

**ANSWER:**    Denied.

201.    Nordic had a duty to disclose to goDesk prior to goDesk executing the Second Statement of Work, that in fact Nordic was continuing to partner with goDesk only to monetize the Software Platform of goDesk's personnel for itself and to claim sole ownership.

**ANSWER:**     Denied.

202.     Nordic had a duty to disclose that after the acquisition by Accrete it no longer even had authority to spin-out a jointly owned company with goDesk's personnel, Mr. Distefano, to monetize the Software Platform.

**ANSWER:**     Denied.

203.     Nordic knew that goDesk was entering the MSA, First Statement of Work and the Second Statement of Work based on mistakes as to the facts.

**ANSWER:**     Denied.

204.     The fact that Nordic was partnering with Mr. Distefano to monetize the Software Platform for itself and to claim sole ownership was peculiarly and exclusively within the knowledge of Nordic, and Mr. Distefano and goDesk could not reasonably be expected to discover it.

**ANSWER:**     Denied.

205.     The fact that Nordic did not even have the authority to spin-out a jointly owned company with Mr. Distefano after the acquisition by Accrete was peculiarly and exclusively within the knowledge of Nordic, and Mr. Distefano and goDesk could not reasonably be expected to discover it.

**ANSWER:**     Denied.

206.     On account of the objective circumstances of Mr. Distefano sending two letters from his counsel claiming ownership of the Software Platform, an Operating Agreement for a jointly owned entity, proposing and Nordic accepting changes to the draft Employment Agreement to exclude from Company Works all previously developed concepts, materials, ideas, and other intellectual property, and also excluding all works of authorship, inventions, intellectual property, materials, documents and other work product developed on his own time, goDesk would reasonably expect disclosure of the fact that Nordic was partnering with goDesk to monetize the Software Platform for itself and in fact was claiming sole ownership.

**ANSWER:**     Denied.

207.     In addition, Mr. Distefano and goDesk would also reasonably expect disclosure of the fact that Nordic needed permission from Accrete to form the jointly owned company with Mr. Distefano.

**ANSWER:**     Denied.

208.     goDesk would not have entered the MSA, the First Statement of Work, and the Second Statement of Work had it known that Nordic would use the terms of those agreements in an attempt to claim sole ownership of the Software Platform and all the code, applications,

schemas, flowcharts, presentations, slides, sales and marketing materials, derivative works thereof, and other materials related to the Software Platform.

**ANSWER:**    Denied.

209.    WHEREFORE, Plaintiff goDesk is entitled to, and demands an award of compensatory damages, prejudgment interest, post judgment interest, court costs, and any further relief this Court deems just and proper.

**ANSWER:**    Denied.

## PRAYER FOR RELIEF

Defendant denies that Plaintiffs are entitled to a judgment in their favor, to the relief requested in their claims, and to any relief whatsoever based on the allegations in the Amended Complaint or otherwise, including each and every prayer for relief set forth in paragraphs (a) through (m) of the Amended Complaint.

## JURY DEMAND

Defendant demands a trial by jury of all issues so triable.

## DEFENSES

Defendant alleges and asserts the following defenses in response to the allegations in the Amended Complaint, undertaking the burden of proof only as to those defenses deemed affirmative by the law, regardless of how such defenses are denominated herein. In addition to the defenses described below, Defendant specifically reserves all rights to assert additional defenses that become known through the course of discovery. Defendant incorporates by reference the factual allegations set forth in its Motions to Dismiss and to Compel Arbitration in support of the following defenses.

## FIRST DEFENSE
### (LICENSE)

1.    Plaintiffs' claims are barred, in whole or in part, because of the existence of an express or implied license.

## SECOND DEFENSE
## (EQUITABLE DEFENSES OF EQUITABLE ESTOPPEL, LACHES, DISCLAIMER, WAIVER, AND UNCLEAN HANDS)

2.      Plaintiffs' claims are barred, in whole or in part, by doctrines of equitable estoppel, laches, disclaimer, waiver, and unclean hands.

## THIRD DEFENSE
## (NO COGNIZABLE INJURY)

3.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not sustained any cognizable damages or injury.

## FOURTH DEFENSE
## (NO ORAL CONTRACT)

4.      Plaintiffs' claims are barred, in whole or in part, because the Parties did not enter into any valid or enforceable oral contract.

## FIFTH DEFENSE
## (NO BREACH)

5.      Plaintiffs' claims for breach are barred, in whole or in part, because Defendant did not breach any duties and/or contractual obligations to Plaintiffs.

## SIXTH DEFENSE
## (LIMITATION ON DAMAGES)

6.      Plaintiffs' claims for damages, if any, are barred or limited in whole or in part by contractual agreement(s) between the parties.

## SEVENTH DEFENSE
## (NEGLIGENCE AND MALFEASANCE)

7.      Plaintiffs' claims are barred, in whole or in part, by their own actions, omissions, negligence, and/or malfeasance.

## EIGHTH DEFENSE
## (CONTRIBUTORY NEGLIGENCE)

8.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' damages, if any, were caused or contributed to by Plaintiffs' own negligence and inaction, and such negligence was greater than any negligence, which is expressly denied, on the part of Defendant.

## NINTH DEFENSE
## (SUPERSEDING CAUSE)

9.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' alleged damages, if any, were the result of one or more intervening or superseding causes or caused by the acts, omissions, negligence, and/or intentional conduct of person, persons and/or entities other than Defendant and were not the result of any act or omission on the part of Defendant.

## TENTH DEFENSE
## (PAROL EVIDENCE RULE)

10.      The claims are barred, in whole or in part, due to the parol evidence rule.

## ELEVENTH DEFENSE
## (FAILURE OF CONSIDERATION)

11.      The claims for breach of contract are barred for lack of consideration and therefore no valid agreements exist.

## TWELFTH DEFENSE
## (FRAUD)

12.      The relief sought in the claims is barred, at least in part, because the contracts forming the basis of the relief sought in the claims were obtained by fraud as alleged in Defendant's Counterclaims.

## THIRTEENTH DEFENSE
## (EXCUSE OF PERFORMANCE)

13.      The relief sought in the claims is barred, at least in part, because Defendant's contract performance was excused.

## FOURTEENTH DEFENSE
## (NO ACTIONABLE MISREPRESENTATION)

14.     The relief sought in the claims is barred, at least in part, because no actionable misrepresentation was made.

## FIFTEENTH DEFENSE
## (UNJUSTIFIABLE RELIANCE)

15.     The relief sought in the claims is barred, at least in part, because any reliance by Plaintiffs was unjustifiable.

## SIXTEENTH DEFENSE
## (LIMITATION OF LIABILITY)

16.     Plaintiffs' claims for special, consequential, incidental, and/or punitive damages are barred by a contractual agreement between the parties.

## COUNTERCLAIMS

1.     This is an action on counterclaims for fraudulent misrepresentation, fraudulent inducement, breach of contract, and declaratory judgment.  Defendant/Counter-Plaintiff Nordic Consulting Partners, Inc. ("**Nordic**") hereby files these counterclaims against Plaintiffs/Counter-Defendants John C. Distefano ("**Distefano**") and goDesk, LLC ("**goDesk**") (collectively "**Counter-Defendants**"), and allege as follows:

## THE PARTIES

2.     Defendant and Counter-Plaintiff Nordic Consulting Partners, Inc. is a Wisconsin corporation with its principal place of business in Dane County, Wisconsin.

3.     On information and belief, Plaintiff and Counter-Defendant John C. Distefano is a citizen and resident of Florida.

4.     On information and belief, Plaintiff and Counter-Defendant goDesk, LLC is a Florida limited liability company with its principal place of business in Collier County, Florida.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Nordic's counterclaims pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000.

6.      This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Nordic's counterclaims that are so related to Counter-Defendants' federal claims within this Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution

7.      This Court has personal jurisdiction over Counter-Defendants by virtue of the fact that they have purposefully availed themselves of the benefits and laws of Wisconsin and have submitted to the jurisdiction of this Court by bringing the underlying action.

8.      This Court also has personal jurisdiction over Counter-Defendants by virtue of an Order entered by the Middle District of Florida on September 21, 2023, transferring the case to the Western District of Wisconsin [Doc. 34] (the "**Order**").   This Court further has personal jurisdiction over Counter-Defendants because they established the requisite minimum contacts in Wisconsin.  Among other things, Nordic transacted business and engaged in a persistent course of conduct in Wisconsin, and Mr. Distefano (goDesk's sole owner) and goDesk (through Mr. Distefano) negotiated and entered into the various agreements with Nordic in Wisconsin.  Counter-Defendants also knowingly and intentionally caused tortious injury in Wisconsin by acts and omissions occurring both in Wisconsin and outside of Wisconsin by breaching obligations owed to Nordic, and otherwise engaging in the tortious and improper conduct set forth in these counterclaims.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### A.    Nordic's Business and Employees

10.    Nordic is a Madison-based award-winning strategic partner to health leaders around the world, helping hospitals and related companies navigate complexity and harness technology to create healthier systems, businesses, and people.  Nordic's talented professionals help clients prioritize, refine strategy, and develop a clear roadmap to better quality care while lowering client costs.  Nordic brings expertise in leadership, IT, and operations to drive long-term success for clients in the healthcare industry.

11.    Nordic maintains a global team of more than 3,000 professionals that combine deep clinical experience, extensive technical knowledge, insightful strategic vision, and proven operational capability to deliver transformational outcomes for providers and the people in their care.

12.    At all times relevant to these counterclaims, James Costanzo ("**Mr. Costanzo**") was the chief executive officer ("**CEO**") of Nordic.

### B.    Mr. Distefano's Engagement with Nordic

13.    Mr. Costanzo met Mr. Distefano in the mid-1990s when they both worked together at various companies, including at Ernst & Young.

14.    In early 2020, Mr. Costanzo contacted Mr. Distefano about leading Nordic's Advisory Services division.  Mr. Distefano and Mr. Costanzo discussed Nordic's organization, the advisory leader role, and the experience Mr. Costanzo was looking for in a candidate for the role.

15.    Mr. Distefano initially declined the role, but shortly thereafter, apparently at the urging of his then-wife, Mr. Distefano changed his mind and reached back out to Mr. Costanzo about exploring the role.  Mr. Distefano represented that he was interested in working as a consultant with Nordic to expand its newly formed Advisory Services division.

16.     Mr. Distefano told Mr. Costanzo, however, that Mr. Distefano had an existing advising engagement with Cambia Health Solutions ("**Cambia**") and that he wanted to maintain that engagement but that it would not take much of his time.  Mr. Costanzo determined that it would not be a conflict for Mr. Distefano to maintain his engagement with Cambia while also working for Nordic given Mr. Distefano's representations that his Cambia engagement would be a minimal time commitment.

C.      **Mr. Distefano's Written Agreements with Nordic**

17.     In May 2020, Mr. Distefano, through his sole proprietorship, goDesk, entered a Master Services Agreement ("**MSA**") and First Statement of Work ("**First SOW**") through which he agreed to provide consulting services for Nordic.

18.     On information and belief, Mr. Distefano used goDesk to enter the MSA and First SOW for tax reasons and because Mr. Distefano was providing minimal consulting services for Cambia.  At all times, however, Nordic and Mr. Distefano understood that Mr. Distefano was the sole employee of goDesk, and would be the only person providing services under the MSA and First SOW.

19.     Under the terms of the First SOW, the scope of Counter-Defendants' employment included drawing on Mr. Distefano's experiences to provide consultative advice on scaling an effective business model, developing executive relationships, solutions development and pricing, and staff management and utilization.

20.     Mr. Distefano's engagement objectives in the First SOW further included (i) providing leadership to design and execute Nordic's Advisory Services organizational restructure, (ii) identifying and recommending opportunities for innovative service/product line extensions that leverage existing capabilities and client relationships, (iii) assessing the viability

(buy v. build) of expanding Nordic's service offerings to compete with KLAS leading firms and to further Nordic's 3-year strategic vision, (iv) identifying and executing enhancements to current business models that maximize revenue, profitability, and client satisfaction, (v) participating in high-level/high stakes client relationship building and business development activities, (vi) producing and providing thought leadership that would position Nordic as an advisory partner to its clients, (vii) actively coaching, mentoring, and developing leaders to grow service lines profitably while improving financial leverage within the Advisory Services division, and (viii) devising solutions (training, accountability, solutions) that empower decision making and grow skillsets to broaden team members' experience and create capacity for increased business development.

21.    Article III.2.A of the MSA provides:

Except as provided by Article III.2.C below, all copyrights all copyrights, patents, trade secrets or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes or works of authorship developed or created by Subcontractor or its personnel in connection with the performance of the Services under this Agreement (collectively, the 'Contract Property') **shall belong exclusively to Nordic** and shall, to the extent applicable, be considered '**work made for hire' for Nordic** within the meaning of Title 17 §101 of the United States Code.

22.    Article III.2.B of the MSA states:

If any element or item of the Contract Property is not a 'work made for hire,' Subcontractor will assign, and shall cause its personnel to assign to Nordic, without any requirement of further consideration, any right, title or interest that Subcontractor and its personnel may have in such Contract Property. Upon request of Nordic, Subcontractor shall take such further actions, and shall cause its personnel to take such further actions, including execution and delivery of instruments of conveyance, as may reasonably be appropriate to give full effect to this Agreement to assign the Contract Property to Nordic hereunder.

23.    Article III.2.C of the MSA provides, in relevant part:

Notwithstanding anything herein to the contrary, to the extent that the Services use concepts, materials, ideas, or other intellectual property previously developed by Subcontractor (the '**Reusable Concepts**') or software code or programs which have been or will be developed by Subcontractor to perform generalized functions or routines which were not initially developed as part of the Services performed under this Agreement (the '**Proprietary Programs**'), Subcontractor shall maintain ownership of the intellectual property rights in such Reusable Concepts and Proprietary Programs. Subject to payment of the Fees and expenses required by this Agreement, *Subcontractor grants Nordic a perpetual, worldwide, nonexclusive, royalty-free license to use, copy, distribute, display, perform, modify, make derivative works of, and otherwise use the Reusable Concepts and/or Proprietary Programs which are embedded, incorporated or made part of the Services, or otherwise necessary for the enjoyment of the Services; it being understood that Nordic may sub-license any or all of its rights for the Reusable Concepts*.

24.    Section VI.1.C.2 of the MSA (the "**Indemnification Provision**") states:

[goDesk] hereby agrees to indemnify, defend, save and hold harmless Nordic and its respective officers, directors, employees, agents, shareholders, heirs, successors and assigns (collectively, "Nordic") from and against, and to reimburse Nordic with respect to, any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, court costs, and costs of appeals) asserted by Nordic, third parties or otherwise, for any claims and/or causes of action of whatsoever nature against or incurred by Nordic by reason of or arising out of the services rendered by [goDesk] or its employees and contractors, regardless of whether or not Nordic is alleged to be at fault or is alleged to have contributed to the alleged wrong doing in any way. Nordic shall give [goDesk] a reasonable notice, in writing, of any such claim, demand, or cause of action. Insurance coverage maintained by [goDesk] is not intended to and shall not in any manner limit the liabilities and obligations otherwise assumed by [goDesk] pursuant to this Agreement.

**D.    Mr. Distefano Misrepresents Interest in the Wellward Software Concept**

25.    Approximately two months after starting his position at Nordic, Mr. Distefano approached Mr. Costanzo about using Nordic resources within Nordic's Advisory Services Group to create a healthcare software platform.

50

26.    Mr. Distefano stated that he had a concept for a comprehensive healthcare software solution that would bring together multiple data points within the healthcare industry.

27.    Mr. Distefano represented that Nordic could monetize the proposed software solution through licensing at various touchpoints, including with health care providers, payers, consumers, retailers, and employers.

28.    At the time Mr. Distefano approached Mr. Costanzo, Mr. Distefano had nothing more than a general concept for the proposed software platform to address common challenges in the healthcare industry.  These were the same challenges that many other companies in the healthcare industry also were attempting to solve though the development of software that would bring together multiple data points within the healthcare industry.

29.    At the time Mr. Distefano approached Mr. Costanzo, Mr. Distefano did not have any tangible work for the proposed software platform.

30.    At the time Mr. Distefano approached Mr. Costanzo, neither Nordic nor Mr. Costanzo had any desire or intention to enter the software development business.

31.    At the time Mr. Distefano approached Mr. Costanzo, Mr. Distefano knew that Nordic and Mr. Costanzo were very interested in expanding Nordic's business to provide services to healthcare payors.

32.    At the time Mr. Distefano approached Mr. Costanzo, Mr. Distefano was leading Nordic's Advisory Services Group, so the proposed use of resources from Nordic's Advisory Services Group appeared to be a typical request to pursue a business opportunity for Nordic.

33.    Mr. Distefano represented that he had strong relationships with Cambia's CEO, Board members, and other key individuals.  Mr. Distefano stated that he had firsthand knowledge that Cambia was interested in licensing or purchasing the proposed software solution once it was

developed, or that Cambia would want to acquire Nordic once Nordic developed the proposed software solution.

34.     Mr. Distefano knew Mr. Costanzo and Nordic would be particularly interested in a potential opportunity with Cambia because Cambia was a healthcare payor.

35.     Because Mr. Distefano's concept was not unique, and many other companies in the healthcare industry also were attempting to address the same challenges through software that brought together multiple data points within the healthcare industry, Nordic was only willing to invest in Mr. Distefano's software because of his representations regarding Cambia's interest.

36.     Based on Mr. Distefano's representations, Mr. Costanzo asked Mr. Distefano to present his concept to Nordic's Board of Directors.

37.     On July 29, 2020, Mr. Distefano made a presentation to Nordic's Board of Directors and discussed Nordic's development of the proposed software solution.

38.     During his presentation to the Board of Directors, Mr. Distefano repeated his representations that Cambia was interested in licensing or purchasing the proposed software solution once it was developed, or that Cambia would want to acquire Nordic once Nordic developed the proposed software solution.

39.     On information and belief, Mr. Distefano's statements regarding Cambia's interest in licensing or purchasing the proposed software solution, or that Cambia would want to acquire Nordic if it had developed the proposed software solution, were knowingly false when made.

40.     Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false representations regarding Cambia's interest in licensing or purchasing the proposed software solution.

41.    Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false representations that Cambia would alternatively want to acquire Nordic once the proposed software solution was sufficiently developed.

42.    Based on this reasonable reliance, Nordic agreed to invest substantial resources into developing the proposed software solution.  Indeed, from 2020 through 2023, Nordic spent more than $4 million developing and marketing the proposed software solution, which eventually became known as "Wellward."

43.    Nordic would not have agreed to invest substantial resources into developing the Wellward software platform but for Mr. Distefano's representations that there was a major healthcare payor (*i.e.*, Cambia) that was interested in licensing or purchasing such software, or in acquiring Nordic because of the software.

44.    At the time Mr. Distefano proposed using Nordic resources to develop the Wellward software platform, Mr. Distefano did not suggest or state that he would own any intellectual property that would be developed using Nordic resources.

45.    During the July 29, 2020 Board Meeting, Mr. Distefano never stated or suggested that he would own any intellectual property related to the proposed software platform that would be developed using Nordic resources.

46.    Indeed, over the course of his work at Nordic, Mr. Distefano made multiple presentations to Nordic's Board of Directors regarding the Wellward software solution.

47.    During these Board presentations, Mr. Distefano never stated or suggested that he owned any intellectual property developed using Nordic resources.

48.    Rather, Mr. Distefano always presented the status of the Wellward software exactly the same as any other product or service line being developed by Nordic.

49.     Nordic disputes that there was any written or oral agreement for Mr. Distefano to own any intellectual property that would be developed using Nordic resources.

50.     To the extent Mr. Distefano intended at the time that he would own any portion of the intellectual property that would be developed using Nordic resources, Mr. Distefano intentionally omitted such material information from his representations to Mr. Costanzo and Nordic.

51.     To the extent Mr. Distefano intended at the time that he would own any portion of the intellectual property that would be developed using Nordic resources, Mr. Distefano's intentional omission of this information made Mr. Distefano's representations materially false when made.

52.     To the extent Mr. Distefano intended at the time that he would own any portion of the intellectual property that would be developed using Nordic resources, Mr. Distefano had a duty to disclose such intention based on Mr. Distefano's representations in the MSA and the First SOW, which stated that Nordic would own any intellectual property developed during Mr. Distefano's work for Nordic.

53.     Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false omissions regarding Mr. Distefano's intention that he would own any portion of the intellectual property that would be developed using Nordic resources.

54.     Based on this reliance, Nordic agreed to invest substantial resources into developing the Wellward software platform despite not previously being in the software development business.

55.     Nordic would not have agreed to invest substantial resources into developing the Wellward software platform if it had known that Mr. Distefano would attempt to claim ownership

of any portion of the intellectual property that would be developed using Nordic resources. Over the course of 2020 through 2021, Mr. Distefano made several additional representations regarding Cambia's purported interest in licensing or purchasing the Wellward software solution, or in acquiring Nordic.

56.    For example, in or around September 2020, Mr. Costanzo asked Mr. Distefano for an update on the status of the software development.

57.    Mr. Distefano's initial response gave Mr. Costanzo concern that the Wellward project was not on track.  When Mr. Costanzo inquired further, however, Mr. Distefano assured Mr. Costanzo that the Wellward project was on track.  Mr. Distefano further represented that he had just spoken to Cambia's CEO and members of Cambia's Board, and that Cambia remained ready to license or purchase Wellward, or acquire Nordic once developed.

58.    Mr. Costanzo reasonably relied on Mr. Distefano's representations and decided to continue investing in the development of Wellward based on such representations.

59.    As another example, in or around the end of the fourth quarter of 2020, Mr. Costanzo again expressed his concerns over the progress of Wellward.

60.    Mr. Distefano again assured and represented to Mr. Costanzo that he had just spoken to Cambia's CEO and members of Cambia's Board, and that Cambia remained ready to license or purchase Wellward, or acquire Nordic once developed, and that development was progressing as expected.

61.    Mr. Costanzo reasonably relied on Mr. Distefano's representations and decided to continue investing in the development of Wellward based on such representations.

62.    On at least one other occasion several months later, in or around July 2021, Mr. Costanzo again expressed his concerns over the progress of Wellward.

63.     Mr. Distefano again assured and represented to Mr. Costanzo that he had just spoken to Cambia's CEO and members of Cambia's Board, and that Cambia remained ready to license or purchase Wellward, or acquire Nordic once developed, and that development was progressing as expected.

64.     Mr. Costanzo reasonably relied on Mr. Distefano's representations and decided to continue investing in the development of Wellward based on such representations.

65.     In addition to the foregoing exemplary verbal representations made by Mr. Distefano to Mr. Costanzo, Mr. Distefano made similar written representations to others within Nordic.

66.     For example, on December 10, 2021, Mr. Distefano emailed Khalid Wahab, Nordic Director, Performance Improvement – Advisory Services, stating "yes, Cambia…the discussions continue to go well…we are looking to do a deep dive workshop day in January."  Mr. Distefano further stated that Cambia was "looking to invest in driving provider partnerships, and so this collaboration platform is intriguing to them."

67.     On January 6, 2022, Mr. Distefano emailed Michelle Lichte at Nordic, stating that the CEO of Cambia Health Solutions was "positioning Wellward as their [Cambia's] payer/provider partnership platform."

68.     On June 28, 2022, Mr. Distefano emailed key Wellward contributors and Nordic personnel Donald Gravlin and Dee Selgrath, stating that the CEO of Cambia "committed that he would champion Wellward to his markets President and Chief of Strategy, in addition to Laurent [CIO and Chief of Strategy at Cambia]."  On information and belief, Mr. Distefano's statements regarding Cambia's interest in licensing or purchasing the proposed software solution were knowingly false when made.

69.     Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false representations regarding Cambia's interest in licensing or purchasing the proposed software solution.

70.     In or around June 2022, Mr. Distefano approach Mr. Costanzo to discuss Wellward. On information and belief, Mr. Distefano was worried that Nordic was going to stop funding the Wellward project after the acquisition by Accrete and Bons Secours Mercy Health ("**BSMH**").  In order to justify Nordic's continued investment, Mr. Distefano stated that Cambia now wanted to co-invest with Nordic and/or Nordic's successor to finish building Wellward.

71.     On information and belief, Mr. Distefano's statements regarding Cambia's desire to co-invest with Nordic and/or Nordic's successor to finish the build of Wellward were knowingly false when made.

72.     Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false representations regarding Cambia's interest to co-invest with Nordic and/or Nordic's successor to finish the build of the proposed Wellward software solution.

73.     As a result of Nordic's reliance on Mr. Distefano's knowingly false representations, Nordic continued to invest substantial funds in developing the Wellward software platform.

74.     Notwithstanding Counter-Defendants' representations, and Nordic's substantial investment, Cambia never licensed or purchased the Wellward software solution.

75.     Notwithstanding Counter-Defendants' representations, and Nordic's substantial investment, Cambia never co-invested with Nordic or its successor to finish the build of the proposed Wellward software solution.

76.     On information and belief, notwithstanding Counter-Defendants' representations, and Nordic's substantial investment, Cambia was never seriously interested in licensing or purchasing the Wellward software solution.

77.     Indeed, based on the results of Mr. Distefano's efforts to sell Wellward, it appears that no organization was ever seriously interested in licensing or purchasing the Wellward software solution.

### E.     GoDesk's Indemnification Obligation

78.     Pursuant to the Indemnification Provision in the MSA, goDesk is required to indemnify Nordic for any and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, court costs, and costs of appeals) with respect to any claims or causes of action by reason of or arising out of the services rendered by goDesk or Mr. Distefano, regardless of whether or not Nordic is alleged to be at fault or is alleged to have contributed to the alleged wrong doing in any way.  (MSA, § VI.1.C.2.)

79.     On June 8, 2023, Nordic sent goDesk a letter notifying goDesk of its indemnification obligation for the claims raised by Plaintiffs in this litigation (the "**Indemnification Demand**").

80.     goDesk is required to indemnify Nordic from and against all liabilities, costs, and expenses related to this litigation, including Nordic's attorneys' fees and costs, because Mr. Distefano's claims arise, in part, from the work that Distefano performed for Nordic under the terms of the MSA in his capacity as the owner, principal, and sole employee of goDesk.

81.     Specifically, Counter-Defendants began working on the Wellward Platform pursuant to the terms of the First SOW issued under the MSA.

82.     Counter-Defendants performed services pursuant to the First SOW from May 9, 2020, to November 30, 2021, including services related to the development and marketing of the Wellward Platform.

83.     Counter-Defendants also performed services for Nordic pursuant to a second Statement of Work dated August 22, 2022 (the "**Second SOW**") issued under the terms of the MSA.

84.     Pursuant to the Second SOW, Counter-Defendants were hired to "provide consulting services related to the platform development and commercialization efforts of the Wellward platform."

85.     Pursuant to the MSA, goDesk also agreed that all intellectual property associated with "any ideas, concepts, techniques, inventions, processes or works of authorship developed or created by [goDesk] and its personnel in connection with the performance of the Services under [the MSA] … shall belong exclusively to Nordic."

86.     Notwithstanding the foregoing, in the Litigation, Mr. Distefano alleges that he owns the rights to the intellectual property related to the Wellward Platform developed during the term of the MSA, including the First SOW and the Second SOW.

87.     Through his allegations, Mr. Distefano effectively asserts that he personally retained ownership of any intellectual property that he worked on in his capacity as the owner, principal, and sole employee of goDesk, even though goDesk specifically agreed that Nordic would own any such contributions.

88.     These allegations trigger the Indemnification Provision because they "aris[e] out of the services rendered by [goDesk] or its employees and contractors."

89.     On June 16, 2023, goDesk sent Nordic a response to the Indemnification Demand (the "**Indemnification Response**").  The Indemnification Response denied that goDesk had any indemnification obligations under the MSA related to the Litigation.

## FIRST CAUSE OF ACTION

### (Fraudulent Misrepresentation)
### Against Mr. Distefano

90.     Nordic re-alleges and incorporates the allegations contained above as though fully set forth herein.

91.     As stated herein, Mr. Distefano made multiple knowingly false representations regarding Cambia's interest in licensing or purchasing the proposed software solution, which eventually became known as the Wellward software platform.

92.     On information and belief, at the time Mr. Distefano made these representations, Mr. Distefano knew that Cambia did not have an interest in licensing or purchasing the proposed software solution, which eventually became known as the Wellward software platform.

93.     Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false representations regarding Cambia's interest in licensing or purchasing the proposed software solution, which eventually became known as the Wellward software platform.

94.     Nordic has suffered damages as a result of its reliance on Mr. Distefano's false representations regarding Cambia's interest in licensing or purchasing the proposed software solution, which eventually became known as the Wellward software platform.

95.     To the extent Mr. Distefano intended at the time that he would own any portion of the intellectual property that would be developed using Nordic resources, Mr. Distefano intentionally omitted such material information from his representations to Mr. Costanzo and Nordic.

96.     To the extent Mr. Distefano intended at the time that he would own any portion of the intellectual property that would be developed using Nordic resources, Mr. Distefano's intentional omission of this information made Mr. Distefano's representations materially false when made.

97.     To the extent Mr. Distefano intended at the time that he would own any portion of the intellectual property that would be developed using Nordic resources, Mr. Distefano had a duty to disclose such intention based on Mr. Distefano's representations in the MSA and First SOW, which stated that Nordic would own any intellectual property developed during Mr. Distefano's work for Nordic.

98.     Nordic reasonably and justifiably relied on Mr. Distefano's knowingly false omissions regarding Mr. Distefano's intention that he would own any portion of the intellectual property that would be developed using Nordic resources.

99.     Nordic has suffered damages as a result of its reasonable reliance on Mr. Distefano's knowingly false omissions regarding Mr. Distefano's intention that he would own any portion of the intellectual property that would be developed using Nordic resources.

100.    Mr. Distefano's fraudulent representations and omissions were willful and malicious, thereby entitling Nordic to punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Breach of Contract)
### Against Counter-Defendants

101.    Nordic re-alleges and incorporates the allegations contained above as though fully set forth herein.

102.    Pursuant to the MSA, Counter-Defendants granted Nordic a perpetual, worldwide, royalty-free license to use, copy, distribute, display, perform, modify, make derivative works of,

and otherwise use any intellectual property (*i.e.* the Reusable Concepts and/or Proprietary Programs), which are embedded, incorporated or made part of the Services, or otherwise necessary for the enjoyment of the Services developed by Nordic during the term of Counter-Defendants' work with Nordic.

103.    Nordic developed the Wellward Platform during the term of Counter-Defendants' work with Nordic, including without limitation during the term of the MSA.

104.    Counter-Defendants breached the MSA by bringing this action asserting ownership over any intellectual property used in the Wellward Platform.

105.    Nordic performed all of its obligations under the MSA by, among other things, paying Counter-Defendants all amounts owed under the agreement.

106.    As a result of Counter-Defendants' breach, Nordic has been damaged through Mr. Distefano's failure to provide the promised license in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### (Indemnification)
### Against goDesk

107.    Nordic re-alleges and incorporates the allegations contained above as though fully set forth herein.

108.    Pursuant to the Indemnification Provision, goDesk is required to indemnify Nordic for any and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, court costs, and costs of appeals) with respect to any claims or causes of action by reason of or arising out of the services rendered by goDesk or Mr. Distefano, regardless of whether or not Nordic is alleged to be at fault or is alleged to have contributed to the alleged wrong doing in any way.  (MSA, § VI.1.C.2.)

109.    Nordic sent goDesk the Indemnification Demand notifying goDesk of its indemnification obligation for the claims raised by Plaintiffs in this litigation.

110.    The claims raised in this litigation are subject to the Indemnification Provision because they arise out of the services rendered by goDesk or its employees and contractors (*i.e.* Mr. Distefano).

111.    As stated in the Indemnification Response, goDesk refused to comply with its indemnification obligations under the MSA.

112.    goDesk breached the Indemnification Provision in the MSA by bringing this action and/or by failing to indemnify Nordic for the causes of action asserted in this litigation.

113.    As a result of goDesk's breach of the Indemnification Provision, Nordic has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counter-Plaintiff Nordic respectfully requests that this Court enter judgment in their favor and against Plaintiffs on each of the foregoing claims and:

A.    A judgment dismissing with prejudice Plaintiffs' claims and denying all relief sought by Plaintiffs;

B.    Award compensatory damages to Nordic in an amount to be proven at trial;

C.    Award punitive damages to Nordic in an amount to be proven at trial;

D.    Award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

E.    Award Nordic its reasonable attorneys' fees and costs; and

F.    Grant Nordic such other and further relief that this Court deems appropriate at law or in equity.

**JURY DEMAND**

Nordic demands a trial by jury on all issues so triable.


Dated: January 24, 2025                    Respectfully submitted,


By: _s/ Jennifer L. Gregor_
Bryan M. Westhoff
POLSINELLI PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Telephone: 312-873-2973
Email: bwesthoff@poleinelli.com

Michael P. Dulin
POLSINELLI PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: 303-583-8239
Email: mdulin@polsinelli.com

Jennifer L. Gregor
GODFREY & KAHN S.C.
One East Main Street, Suite 500
Madison, WI 53703
Telephone: 608.257.3911
Email: jgregor@gklaw.com

*Attorneys for Defendant/Counter-Plaintiff*
*Nordic Consulting Partners, Inc.*