IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

JOHN C. DISTEFANO and
goDESK, LLC,

        Plaintiffs,                              OPINION and ORDER

        v.                                     23-cv-657-wmc

NORDIC CONSULTING PARTNERS, INC.,

        Defendant.
_____

      This case arises out of a dispute over the ownership of a healthcare software platform known as "Wellward."  Plaintiffs John Distefano and his company, goDESK, LLC, claim that Wellward was created using intellectual property that Distefano brought to defendant Nordic Consulting Partners, Inc. under an oral agreement with Nordic though its CEO, which allowed Distefano to retain ownership and control of the platform, even as Nordic's personnel coded, developed and marketed it.  In contrast, defendant Nordic maintains that *its* personnel created the Wellward platform under several, written agreements with plaintiffs, and as a result, Nordic owns the platform and associated intellectual property rights.  Plaintiffs assert several contract-based and copyright claims against Nordic, while Nordic has counterclaimed for fraudulent misrepresentation and breach of contract against Distefano, as well as an indemnification claim against goDESK.

      Before the court is Nordic's motion for summary judgment as to all of plaintiffs' claims.  (Dkt. #138.)  Based on the record at summary judgment, the court agrees no reasonable jury could find that Distefano and Nordic formed any oral contract, much less

one not fully superseded by subsequent writings, nor find that Nordic breached any written contract with plaintiffs.  Rather, the undisputed factual record establishes that what Distefano brought to Nordic was the concept of a digital health platform for which he had not yet developed any computer code or useable, marketable software.  While Nordic concedes Distefano's ongoing right to use his original concept, the record further establishes that the digital healthcare platform eventually named Wellward was coded and developed by Nordic using Distefano's original concept, actually incorporated software already owned and developed by Nordic, and went far beyond Distefano's original schematics.  Moreover, under the written terms of the agreements between the parties, a reasonable jury would have to find that Nordic owns the Wellward software platform, along with the intellectual property developed while plaintiffs were working with Nordic. Accordingly, Nordic's motion for summary judgment will be granted in full.

## UNDISPUTED FACTS[1]

### A. Distefano's Initial Concept for a Healthcare Digital Software Platform

Plaintiff Distefano is a healthcare consultant, as well as an owner and sole employee of plaintiff goDesk, LLC, which contracts out his health technology consulting services.  At least on paper, Distefano's wife holds 51% of the stock in goDesk in her name, while Distefano himself holds 49% in his name.  In 2019, Distefano began working on a digital health software platform that was intended to educate and motivate consumers to engage

---

[1] The following findings of fact are undisputed unless otherwise noted.  The facts are drawn from the parties' proposed findings of fact and responses, as well as the underlying evidentiary record where appropriate.

in healthy behaviors, such as nutrition, diet and exercise. Distefano also contemplated that his digital health platform would be available on the internet and mobile device apps.

Beginning in August 2019, Distefano began converting his ideas into "documents, schematics and designs." By May 2020, Distefano had created between 40 and 60 such documents, many purportedly containing numerous schematics, technical requirements and specifications. According to Distefano, he also had converted some documents into a "computer format," but had not written any code using traditional computer language. (Distefano dep. (dkt. #137) 30.) Although plaintiffs state that Distefano created documents containing "hundreds" of schematics and designs, the only tangible evidence of such documents are those documents for which Distefano eventually obtained copyright protection. Plaintiffs have not produced any other, pre-Nordic documents, despite Distefano testifying at his deposition that the computer on which all but one or two of the documents were stored was in his possession. (*Id.* at 31–32.) Those one or two documents were purportedly "transaction flow documents" that were stored on an external hard drive that Distefano lost. (*Id*. at 31–34.)

Also in 2019, a technology company, Interactive Communications ("InComm"), approached Distefano to consult on ways to monetize the large amounts of consumer data that company had amassed through its existing networks and technologies. Before Distefano started officially consulting with InComm, Distefano decided that InComm could potentially work with him to develop his own digital health platform. Accordingly, Distefano obtained copyright protection in November of 2019 for seven of the documents he had created regarding his concept for a digital health platform, titled: (1) Competitive

Landscape; (2) Day in the Life; (3) Executive Summary; (4) Go to Market; (5) Implementation Planning; (6) Solution Design; and (7) Value Proposition. (Copyright Registration (dkt. #164-6).) These documents also referred to InComm's contemplated participation in the digital health platform. (Dkt. ##164-7 to 164-13.)

Distefano was formally engaged by InComm in February 2020 and acted as an independent consulting contractor for approximately two months. In March 2020, Distefano made a PowerPoint presentation to InComm representatives, proposing it develop "InComm HealthCare Solution," a digital health platform, using his intellectual property. According to Distefano, his presentation introduced components of his platform that he thought fit well into InComm's current business and asset base. (Distefano dep. (dkt. #137) 43.) Specifically, the presentation included documents that were substantially the same as those that Distefano had copyrighted. However, InComm declined to move forward with developing a digital health platform.

### B. Distefano is Recruited by Nordic

In February 2020, while he was still consulting with InComm, Nordic's CEO, James Costanzo, reached out to Distefano about building a consultancy and advisory services division at Nordic. At the time, Nordic advertised itself as a "strategic partner to health leaders around the world," able to help "hospitals and related companies navigate complexity and harness technology to create healthier systems, businesses and people." (Dkt. #99, at 47, ¶ 10.) As a friend and former colleague, Costanzo wanted Distefano to serve as head of Nordic's Advisory Services Group. Initially, Distefano was not interested,

4

and when Costanzo contacted him again in March 2020, Distefano also said he was busy with his own consulting work and not interested in joining Nordic.

At that time, Costanzo instead proposed Distefano continue consulting *and* join Nordic on a part-time basis. However, the parties dispute whether Distefano talked to Costanzo about his concept for a digital health software platform in March 2020. While Costanzo denies that Distefano had discussed his concept at the time, Distefano testified that he told Costanzo about the possibility of InComm being a "build partner" for his digital health software platform, which he considered his "life's work," and questioned whether Nordic's private equity owners would value it. (Distefano Dep. (dkt. #137) 83.) Regardless, on March 31, 2020, Costanzo emailed Distefano again about a potential position at Nordic, stating that Nordic's private equity owners were interested in raising the value of the company so that they could potentially sell it in two or two-and-a-half years.

The next day, on April 1, 2020, Distefano and Costanzo spoke on the phone, although the parties again dispute what was discussed. Specifically, Distefano testified he told Costanzo that he would work at Nordic only if: (1) he was paid $25,000 to $30,000 per month; (2) he could direct a team to program his digital health software platform; (3) Nordic hired a chief of staff to help organize and manage collateral related to the digital health software platform; and (4) Nordic would establish a vendor channel from a marketing and branding perspective. (*Id.* at 86.) Distefano further maintains that Nordic (through Costanzo) and he reached an oral agreement during this April 1 call that: (1) Distefano would bring his intellectual property ("IP") to Nordic; (2) Distefano would

5

maintain ownership of that IP while a team of coders provided by Nordic would, at his direction and control, code the digital health software platform; (3) when the platform was sufficiently ready to be "operationalized," they would transfer the coded, tested platform to a separate entity jointly owned by Nordic and Distefano; and (4) at the point of this spin-out, the specific ownership shares of this new entity would be determined based on the ongoing commitment of resources and the investment made by Nordic and Distefano. (*Id.* at 103.) Distefano maintains that his consulting or working for Nordic was *not* part of this oral agreement.

Distefano did not write down the terms of this oral agreement anywhere, although he did take detailed notes on other things discussed during the phone call, such as how he could help Nordic generate additional revenue. Nor did Distefano send Costanzo any emails memorializing the terms of the original oral agreement. For his part, Costanzo denies that any oral agreement was reached during the phone call. Both sides do agree that Distefano did *not* agree to consult for or work for Nordic on the April 1 call.

On April 28, 2020, Costanzo sent Distefano an email offering him the position of "Practice Leader of Advisory Services" at Nordic. However, at Distefano's request, for tax purposes and so Distefano could finish a consulting engagement with another company, Nordic agreed to characterize Distefano as a contractor hired through Distefano's consulting company, goDesk LLC. As part of the negotiations regarding Distefano's

6

potential position, Nordic also agreed to grant Distefano units in Nordic's Equity Appreciation Plan (EAP), which were granted to those in senior executive positions.[2]

### C. Distefano Signs the Master Services Agreement and First Statement of Work

On May 9 and 18, 2020, Distefano signed the First Statement of Work (the "First SOW") and the Subcontractor Master Services Agreement (the "MSA"), respectively. Both agreements were executed by Distefano as a representative of goDesk, LLC.

#### 1. First SOW

Under the First SOW, Distefano was appointed as "Practice Leader, Advisory Services." The First SOW included a detailed description of services that goDesk would provide to Nordic, titled "Engagement Objectives," including:

- Identify and recommend opportunities for innovative services/product line extensions that leverage existing capabilities and client relationships;

- Assess the viability (buy v. build) of expanding Nordic's service offerings to compete with likes of today's KLAS leading firms and to further Nordic's 3-year strategic vision; and

- Identify and execute enhancements to current business models that maximize profitability, and client satisfaction.

In exchange, goDesk was entitled to receive a quarterly incentive bonus of $15,000 based on hitting certain milestones (the "Quarterly Incentive Bonus").

---

[2] Nordic did not generally offer EAP units to consultants, but Nordic considered Distefano and goDesk to be essentially the same entity, despite goDesk being the contracting party under the agreements with Nordic.

### 2. MSA

Signed nine days later, the MSA contained an express provision assigning exclusive intellectual property rights to Nordic for "any ideas, concepts, techniques, inventions, processes or works of authorship developed or created by [goDesk, LLC] or its personnel in connection with the performance or the Services under this Agreement[.]"  (Dkt. #47-2, § III.2.B.)   The MSA referred to any such ideas, concepts, techniques, inventions, processes or works of authorship as "work made for hire" for Nordic.  (*Id.*)  Moreover, if something did not qualify as a "work made for hire," goDesk was required to "assign, and shall cause its personnel to assign to Nordic, without any requirement of further consideration, any right, title or interest in that Subcontractor and its personnel may have in such Contract Property."  (*Id.*)

With respect to "intellectual property previously developed by [goDesk]," the MSA stated that goDesk would "maintain ownership of the intellectual property rights in such Reusable Concepts and Proprietary Programs."  (*Id.* Art. III, § 2(C).)  However, "[s]ubject to payment of the Fees and expenses required by this Agreement, [goDesk] grants Nordic a perpetual, worldwide, nonexclusive, royalty-free license to use, copy, distribute, display, perform, modify, make derivative works of, and otherwise use the Reusable Concepts and/or Proprietary Programs which are embedded, incorporated or made part of the Services, or otherwise necessary for the enjoyment of the Services; it being understood that Nordic may sub-license any or all of its rights for the Reusable Concepts."  (*Id.*)

Finally, the MSA contains a merger clause, stating:

> **Entire Agreement.** This Agreement . . . and any Statements
> of Work set forth the full and complete agreement of the

> Parties with respect to the subject matter hereof. All prior agreements, correspondence, discussions and understandings of the Parties (whether oral or written) are merged herein and superseded hereby, it being the intention of the Parties that this Agreement shall serve as the complete and exclusive statement of the terms of their agreement together.

(*Id.*)  Article VII, Section 9.


### D. The Advisory Services Group and Distefano's Plan to Develop Digital Health Software Platform

As "Practice Leader, Advisory Services," Distefano led Nordic's entire Advisory Services Group, which was the largest group within Nordic, and reported directly to Nordic's CEO, Costanzo.  The Advisory Services Group was made up of three business lines: (i) Digital Health; (ii) Implementation Services; and (iii) Performance Improvement. Distefano established and held regular meetings with the Advisory Core Leadership Team, which included the leaders from each business line.

Almost immediately after Distefano started leading Advisory Services, he began promoting the idea that Nordic should invest in and build a digital health software platform.  In May 2020, Distefano transferred from his personal computer three documents that he had created that focused on the idea of creating digital healthcare solutions to drive growth and revenue at Nordic: (i) Nordic Health Advisory Path to Growth; (ii) Nordic Health Advisory Leadership Discussion Guides; and (iii) InComm Healthcare May 2020 Potential Partnering Model for Digital Health Platform.  All of these documents proposed functionality and aspects of digital health solutions that Distefano eventually advocated being incorporated into a digital health platform built by Nordic.

9

On May 23, 2020, Distefano sent an email to the members of the Advisory Core Leadership Team, stating his belief that: "Nordic is the perfect firm to bring to life a truly transformative consumer-oriented digital health platform." (Dkt. #143-22.) To his email, Distefano attached a PowerPoint deck titled "Digital Health Platform Point-of-View," which presented a vision for Nordic to build a consumer-driven, digital health software platform, in partnership with a "Transaction Platform Partner."[3] (Many aspects of the concepts laid out in his PowerPoint presentation were eventually incorporated into the Wellward platform.)

On June 23, 2020, Distefano also sent Costanzo an email providing "background on the vision statement for a potential partnership with InComm Healthcare that could lead us down an exciting digital health path." (Dkt. #143-23 at 6964.) Attached to the email, Distefano sent Costanzo a PowerPoint deck titled "Nordic Digital Health Platform Vision Overview," which included a concept for Nordic to build a digital health software

---

[3] Nevertheless, at his deposition, Distefano testified that the "Path to Growth Pyramid" in this "*Nordic Health Advisory* Path to Growth" PowerPoint was *not* a pathway to grow Nordic's Advisory Services group, nor was it his plan to advise Nordic leaders on growing such a business, but rather, it was his general ideas about potential business, not specific to Nordic. For reasons elaborated in the opinion below, this testimony is simply implausible based on the documents themselves, which refer to Nordic throughout, and the parties' subsequent conduct. Thus, his testimony alone does not create a genuine dispute of fact sufficient to avoid summary judgment. *See Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1261 (7th Cir. 2025) (holding that a plaintiff cannot survive summary judgment where their version of events is "so 'internally inconsistent or implausible on its face' that 'no reasonable person would believe it'"); *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) ("testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it."); *Lacy v. Berge*, 921 F. Supp. 600, 607 (E.D. Wis. 1996) ("Mere conclusory assertions, unsupported by specific facts, made in depositions or affidavits opposing a motion for summary judgment, are not sufficient to defeat a properly supported motion for summary judgment."); *see also Vinewood Cap., LLC v. Dar Al-Maal Al-Islami Tr.*, 541 Fed. App'x 443, 447–48 (5th Cir. 2013) (affirming summary judgment and finding no oral agreement because "a party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario").

platform. The "Nordic Digital Health Platform Vision Overview" PowerPoint deck proposed that Nordic could expand into new "Products & Services," including "Consumer facing health apps," and referred to the proposed digital health platform as the "Nordic digital health platform." (*Id.* at 6971, 6974, 6977 at 6978.) Nowhere in that email did Distefano mention a prior oral agreement; nor did he refer to any joint venture between Nordic and him, though he did propose the possibility of a partnership between Nordic and InComm. To the contrary, the plan as presented in Costanza's PowerPoint presentation and cover email consistently referred to the potential digital health platform as the *Nordic* digital health platform or solution.

### E. Nordic's Development of the Digital Health Software Platform

By July 2020, Nordic's Advisory Services Group had started discussing development of a digital health software platform. Nordic initially adopted the name "Pixar" to refer to this digital health platform, but it eventually became known as "Wellward."

On July 21, 2020, Costanzo sent Distefano an email inviting him to present at the next meeting of Nordic's Board of Directors to talk to the Board about the "Digital Health opportunity" Distefano was working on with InComm. The meeting was held on July 29, 2020. During the meeting, Distefano made a presentation using slides he had created for the digital health software platform. Distefano's presentation to Nordic's Board was titled "Investing for Growth," and proposed that Nordic should invest in creating a digital health platform. Describing the value of the proposed digital health platform, Distefano stated it could accelerate Nordic's move into new markets and reach new clients. Distefano's

11

presentation included logos for Nordic and InComm again without mention of any past oral agreements or assignment of IP rights to himself. While members expressed initial uncertainty about the proposed software platform, the Board eventually supported development after Costanzo clarified how the platform would fit into Nordic's larger business plans.

After the Board agreed to fund the development of a digital healthcare platform, Distefano engaged other personnel at Nordic to consult on the project, which he then referred to as "Nordic Pixar," including members of the Advisory Services Group, Nordic's Director of Finance, and Nordic's CFO. In those communications, Distefano again referred to "Pixar" as a "Nordic project" and a "growth initiative" of its Advisory Services group. The Digital Health line of Advisory Services began working on coding the platform.

On September 2, 2020, Nordic and InfoTeq Consulting LLC also entered into a "Subcontractor Master Services Agreement" and "Statement of Work," with Don Gravlin signing those documents as the owner of InfoTeq Consulting LLC, recognizing Gravlin as one of the members of the team that would build the digital health software platform. In turn, Distefano signed both agreements on behalf of Nordic in his capacity as its "Advisory Practice Lead." These agreements also refer to the digital health software platform as the "Nordic Solution" and the "Nordic Digital Health Platform," and like the agreements between Distefano's company, goDesk, and Nordic, included a provision granting exclusive intellectual property rights to Nordic for any work Gravlin or other InfoTeq personnel performed while engaged by Nordic.

Also in September 2020, the Advisory Services Group met to discuss development of the platform, with the agenda including the following points:  "(1) Build a digital wellness platform; (2) How to incentivize behavior change; (3) Chronic condition management; (4) Driving consumer wellness management at a holistic level; (5) Look at data from the payee side; (6) Who is the right partner? Realistic use cases; and (7) Combination of technology and business coming together."  During this month, Distefano noted in an email that the leader of Nordic's Digital Health line was responsible for collaborating on the "Nordic digital health platform," including by defining services, technologies and priority business uses.  Later that month, Distefano created a document titled "*Advisory* Strategic Growth Framework Implementation Workstreams," which identified a nine-month time frame for the Advisory Services Group to innovate Nordic's digital health platform.

The following month, Nordic paid Distefano/goDesk the full Quarterly Incentive Bonus for the period of September to November 2020.  Distefano had previously sent Costanzo a set of proposed milestones for the Quarterly Incentive Bonus to be paid for his work as "Practice Leader, Advisory Services" consistent with the First SOW and MSA.  Those milestones included:

- Define digital health solutions roadmap, including strategic partnerships;

- Define fit-for-future solution on framework and portfolio of service offerings; and

- Lead the creation of a solution innovation council to provide solution governance.

As Costanzo understood it, the milestone for:

- "*Define digital health solutions roadmap, including strategic partnerships*" referred to Distefano's work developing the digital health software platform, which was

13

originally named Pixar and later became known as Wellward, and the potential partnership with InComm;

- "*Define fit-for-future solution on framework and portfolio of service offerings*" related to that same digital health software platform; and

- "*Lead the creation of a solution innovation council to provide solution governance*" related to the "solution council" proposed by Distefano for purposes of aiding in the development of the platform.

In contrast, Distefano maintains that these milestones did not refer to the digital software platform at all, but rather to other projects goDesk was working on.

### F. Nordic and InComm's Data Sharing Agreement

On December 28, 2020, Nordic and InComm entered into their own formal agreement contemplating that InComm would share data, which Nordic would then use to create its digital health software platform (the "InComm Data Sharing Agreement"). (Dkt. #143-40.) In exchange, Nordic would organize and aggregate the data for InComm. The leader of the Digital Health line signed the agreement on behalf of Nordic, and InComm's Executive Vice President signed for InComm. After the agreement was signed, the Performance Improvement group at Nordic dedicated three employees to the then "Pixar" project with the goal to "evolve the strategic thinking on its behavior model to drive patient interventions and more personalize care planning." (Dkt. #143-42.)

On January 29, 2021, Distefano next sent Costanzo a set of proposed milestones from December 2020 through February 2021 for his Quarterly Incentive Bonus to be paid to goDesk. Among others, those proposed milestones included: "Establish one strategic technology partnership in the digital solutions space." As Costanzo understood it, this

milestone referred to InComm and the InComm Data Sharing Agreement signed in December 2020.  While Distefano disputes that this goal referred to the InComm agreement, he provides no other plausible explanation of the goal's meaning.  Regardless, Nordic paid Distefano/goDesk the full Quarterly Incentive Bonus under the First SOW for the period of December 2020 through February 2021.

### G. Distefano Seeks Continued Investment in Nordic's Development of the Digital Health Platform

In March 2021, the leader of Nordic's Digital Services line proposed hiring another consultant to provide technical help to build the digital health platform, including coding. Nordic's General Counsel, Irina Brault, then asked Distefano about the platform and tools that such a consultant would develop and how they would be used by Nordic.  Distefano responded that the components developed by that consultant "will not be sold directly to clients, but … will form the technical basis of future elements that will be sold to clients, so these demonstration components do represent IP to Nordic." (Dkt. #143-47.)  After the consultant was hired, Brault also asked Distefano to direct the consultant to maintain a list of the IP inventory associated with the digital health software platform, including any elements that were commercially available, vendor supplied, client supplied, or Nordic IP. (Dkt. #143-58.)  When instructing the consultant to maintain an IP list, however, Distefano did not indicate that any of the IP associated with the digital health platform was owned by him.

On May 5, 2021, Distefano sent an email to Costanzo and Nordic's CFO, seeking continued investment to further develop Nordic's digital health software platform,

attaching another PowerPoint deck, this time titled "Nordic Next-Generation Health and Wellness Digital Platform, 'Investor' Presentation." That presentation discussed buyers for digital health solutions, stating that most major health plans were investing in and/or acquiring digital health platforms. The presentation proposed various ways that Nordic could make money from the digital health platform, and requested that Nordic invest an additional $486,250 between May and June 2021 to create "client pilots" of the digital health software platform. Costanzo and Cole both approved the spending request.

Throughout 2021, Nordic's Digital Health group employees wrote source code for the digital health platform. In fact, Nordic's employees and subcontractors are the only people who wrote useable source code for the platform. They also incorporated into the platform a software product that Nordic had developed previously called the "Health Data Connector." Also in 2021, after its Digital Health group leader resigned, Nordic hired yet another subcontractor to work under a Statement of Work for the digital health platform, which Distefano again signed on behalf of Nordic. Within that were multiple tasks related to designing and developing the digital health software platform, including:

- Advise Nordic team as they define the PIXAR Product;

- Advise PIXAR Team as they create & refine the candidate list of Nordic's Digital Health Platform Product Features (Product Backlog) based on Nordic's existing clinical and claims system information integration capabilities and the proposed future InComm & Client partnership; and

- Consult with team as they rank and create PIXAR high value data features...

(Dkt. #143-54.)

16

In June 2021, Nordic once again paid goDesk/Distefano for the Quarterly Incentive Bonus under the First SOW covering the period from March through May 2021. Distefano's proposed milestones for that period included: "Develop initial thought leadership for Nordic's NextGen Digital Wellness Platform." There is no dispute that this goal referred to the Pixar platform, eventually known as Wellward.

### H. Employment Agreement and General Release

By the fall of 2021, Distefano and Nordic had agreed that he should become an employee, rather than a subcontractor, because of a potential sale of Nordic. On or about November 3, 2021, Distefano signed an "Employment Agreement." Under the terms of that agreement, Distefano agreed to "devote all of [his] business time and best efforts, business judgment, skill and knowledge exclusively to the advancement of the Business and to discharge of [his] duties and responsibilities hereunder." (Dkt. #47-4 at § 3(b).) Business is defined in that agreement as:

> all products and services provided or planned to be provided by the Company and/or its Affiliates, successor and assigns, during the Employee's employment, including, without limitation, the provision of services related to the implementation and optimization of electronic health records technologies; data and analytics; revenue cycle; performance improvement; IT operational outsourcing and application managed services; enterprise resource planning; and any other services that the Company and/or its Affiliates, successor and assigns, provide or plan to provide.

(*Id.* at § 11(b).)

The scope of Distefano's work under the Employment Agreement was identical to the scope of work under the First SOW and MSA. Under the Employment Agreement,

Distefano was the "Global Advisory Practice Leader," reporting directly to Nordic's CEO. Distefano served as the head of the Advisory Services group under both the First SOW and the Employment Agreement.

Like the MSA, the Employment Agreement also contained a provision governing ownership of any intellectual property created or developed during Distefano's employment with Nordic. Specifically, the agreement grants "exclusive ownership" to Nordic of any intellectual property created or developed by Distefano during his employment with Nordic or using Nordic's resources. (Dkt. #47-4, § 7(a).) Section 7 of the Employment Agreement further states, "[n]otwithstanding the foregoing, the definition of Company Works does not include any works of authorship, inventions, intellectual property, materials, documents or other work product developed (alone or jointly) by the Employee (i) entirely on the Employee's own time and (ii) any concepts, materials, ideas, or other intellectual property previously developed by Employee." Distefano proposed edits to Section 7 to exclude from the definition of "Company Works" any works developed "entirely on the Employee's own time." Further, as part of the Employment Agreement, Distefano similarly signed a "General Release of All Claims" (the "General Release"), in which he expressly released all claims he "ever had, now have or hereafter can, shall or may have, against [Nordic] for, upon, or by reason of any alleged or actual matter, cause, or thing from the beginning of time until the date [that Distefano signed the General Release]." (Dkt. #143-60, Ex. A.)

Finally, like the MSA that preceded it, the Employment Agreement also contained a merger clause, stating that it "constitutes the sole understanding of the parties with

18

respect to the matters provided for herein and supersedes all prior and contemporaneous oral and written agreements and understandings between the parties with respect to the subject matter of this Agreement." (*Id.* at 15).

## I. Distefano Resigns his Employment

On February 21, 2022, just three months after the effective date of his Employment Agreement, Distefano notified Nordic that he intended to resign effective as of August 21, 2021. The next day, Distefano sent an email from his Nordic email address to his personal Gmail account, attaching his Employment Agreement and the MSA. On March 1, 2022, Distefano also sent an email from his Nordic email address to his personal Gmail account, attaching a document entitled "JD IP Claims," which was apparently his attempt to describe his ownership of certain IP related to Nordic's digital health platform. Distefano also sent himself an email attaching a document titled "Supporting Background for IP Claims," which states that:

> Sub-contractor had previously developed Intellectual Property which was brought to Nordic – Subcontractor discussed with Nordic CEO prior to any contractual relationship the existence of concepts, ideas and works constituting Intellectual Property developed by Sub-contractor in previous work. Subsequent to a sub-contracting agreement being established between Sub-contractor and Company, discussions, meetings and collateral reviews were conducted during May and June, 2020, with CEO and other members of Nordic leadership regarding the Intellectual Property. Additionally, in June 2020, Subcontractor introduced Nordic CEO and other leadership to third-party data provider and then subsequently facilitated a strategic data partnership between the third-party and Nordic to explore future developments related to Subcontractor Intellectual Property."

(Dkt. #143-68.) By this time, "Pixar" had also formally been renamed "Wellward," and on April 7, 2022, Distefano sent an email to Costanzo, stating in part, "[l]et's be sure to

find time next week to discuss the details around my transition, and also we can talk through the next steps on the legal aspects of my Wellward IP ownership so we can avoid any surprises there." (Dkt. #143-69.)

### J. First Demand Letter

On May 12, 2022, Distefano's attorney sent Nordic a demand letter, alleging that he had developed IP before performing any services for Nordic and that he maintained ownership of such IP, as stated in Section 7 of the Employment Agreement. (Dkt. #143-70.)  The letter asserted that Distefano's IP was the "foundation" for the Wellward platform, and proposed a license agreement for his IP under which Nordic would provide him: (1) a revenue share of future sales bookings related to platform; and (2) "founder's shares" of equity in any future entity, public or private, that was based directly or indirectly upon the platform or Distefano's IP.  The letter did not mention any oral agreement or any other existing agreement under which Distefano had previoulsy claimed ownership in IP related to Wellward, nor assert that Nordic had agreed to spinout Wellward into a separate company to be jointly owned by Distefano.

On May 16, 2022, Distefano sent Nordic's GC Brault an email following up on his counsel's demand letter, explaining that its purpose was to make sure he was following "a formal process in establishing an understanding around the IP, as well as to propose straw model business principles for Wellward."  (Dkt. #143-71.)  Distefano stated in the email that he would coordinate with his legal support to propose a governance plan, management

structures and financials to help jump start the discussions around a formal business treatment of Wellward.

### K. Distefano Advocates for a Spinoff Company After Nordic's Acquisition by Accrete Health Partners

On June 1, 2022, Accrete Health Partners ("Accrete"), a strategic holding company of Bon Secours Mercy Health, acquired Nordic. That same day, Distefano sent an email to Cambia Health, a potential customer of Nordic, announcing the Accrete Acquisition. (Dkt. #143-72.) Distefano stated in the email that, "[w]e expect a separate release over the next 30-60 days announcing me as the General Manager/CEO of Wellward LLC." (*Id.*) However, neither Nordic nor Accrete had discussed such a plan with Distefano.

Also on June 1, Distefano's attorney sent Nordic a second demand letter, stating that the Wellward platform concept was something that Distefano had conceived of and championed prior to his consulting agreement with Nordic, resulting in some "ambiguity" on how Distefano could move forward in his business endeavors. (Dkt. #143-73.) The letter proposed that: (1) Nordic and Distefano create an independent business entity to develop and commercialize predictive analytic software platforms utilizing the concepts, know-how, and software that was brought to and developed during the Wellward project; (2) the new entity would initially operate and be funded as a business unit of Nordic, but would proceed independently with a mission statement to maximize the commercialization of the integrated platform concept of the Wellward project; (3) the new business entity could be spun off in the future should the commercialization be successful and broader than the core business of Nordic; (4) Nordic would owe a majority interest in the new

business entity with Distefano owning a minority interest, but acting as the general manager or CEO; (5) all IP associated with the Wellward project, including that owned by Distefano and Nordic would be assigned to the new entity; and (6) Nordic would receive an irrevocable, fully paid up license to all such IP so as to continue to develop and realize the commercial value of the Wellward product.  The letter ended by stating, "[p]lease let us know if [Nordic] is interested in this proposal and we can start to put more substance to the proposal."  (*Id.*)

Two weeks later, on June 15, Distefano next sent another email to Cambia's CEO, stating, "[e]ffective June 1, I transitioned to General Manager and CEO of Wellward, a newly forming subsidiary of Nordic."  (Dkt. #143-74.)  This, too, was a false representation since no such transition had been agreed to by Nordic or Accrete, nor was the formation of a subsidiary in the works.  Moreover, on June 20, Distefano sent an email to Costanzo and Brault (Nordic's general counsel) stating that he had "taken the first steps in drafting an initial operating agreement for a Wellward LLC," and attaching a draft for a Wellward spinoff company (the "Draft Operating Agreement").  (Dkt. #143-75.)  The email also acknowledged that the draft was "only a straw model of course," and that Distefano was "very much open to ideas and refinements to make this agreeable and in-line with [Costanzo's] vision."  The email closed by stating, "[p]lease let me know your thoughts on discussing any changes to the proposed operating agreement."  (*Id.*)  Finally, on July 19, Distefano emailed the sales lead for Wellward, also discussing his Draft Operating Agreement for Wellward LLC, stating, "as you and I already discussed, the New [company] has not been board approved and exactly how, when or if we move forward is still

22

uncertain," but that he was "advocating" for a "Nordic-owned holding company." (Dkt. #143-76, 143-77.)

At a subsequent August 16, 2022, meeting between Distefano and Costanzo, Costanzo confirmed that Distefano needed Board approval to spin-out Wellward into a separate company. The following day, Distefano emailed Costanzo that he was "[e]ager to hear from [Costanzo] on the Board discussions." (Dkt. #143-79.) Distefano further stated, "[a]s we talked, given that my garden leave period ends on the 21st of this month, I am very agreeable to move forward as a contractor to Nordic – much like I was when first working." (*Id.*) On August 29, Distefano also sent another email to Cambia, again misrepresenting himself to be the "General Manager, Wellward Digital Services – A Nordic Global Entity," despite his not holding that position and Wellward still being nothing more than a software platform owned by Nordic.

### L. The Second Statement of Work

That same day, August 29, Distefano sent an email to Costanzo, Brault, and Nordic's head of Human Resources, attaching a proposed statement of work that Distefano had drafted for his continued work for Nordic as a consultant. (Dkt. #62-2.) Specifically, Distefano proposed his role would be "General Manager, Wellward," and that he would receive a one-time, performance bonus of $20,000 contingent and payable upon the delivery and production activation of the first "Wellward platform services client" by December 31, 2022. The "engagement scope" in Distefano's newly proposed SOW was

focused on the Wellward platform, and contemplated that Distefano would guide its further development and commercialization.

On September 2, 2022, Nordic GC Brault responded to Distefano's draft statement of work by attaching a revised draft with proposed edits. (Dkt. #143-82.) In this Revised SOW, Distefano's role was changed from "General Manager, Wellward" to "Consultant" and the "engagement objective" was deleted. Specifically, instead of Distefano/goDesk "provid[ing] input and recommendations for the creation of a separate business entity or holding company for the Wellward Platform, including operating agreement, and ownership and governance structure," Nordic's Revised SOW stated that Distefano would "provide consulting services related to the platform development and commercialization efforts of the Wellward platform." (*Id.*) Nordic's Revised SOW also changed several other references, emphasizing that Distefano would provide "oversight" and "input," rather than providing "leadership," and that Distefano/goDesk would "[c]ollaborate with [the] Wellward platform development team, Nordic business lines and Nordic Client Partnerships organization to define Wellward platform release strategy." (*Id.*) On September 11, 2022, Distefano signed this second statement of work (the "Second SOW") containing all of the changes made by Nordic.

On September 27, Distefano exchanged emails with Costanzo in advance of a meeting with Cambia. In that exchange, Distefano suggested alluding to a potential Wellward "spin-off" company during the meeting in which Cambia could have a potential ownership interest. (Dkt. #143-83.) However, Costanzo responded. "At this point, I would not talk about ownership at all. *We do not yet have approval to spin this off from [Accrete,]*

and I would not want to make commitments that we may or may not be able to keep." (*Id.* (emphasis added).)   Distefano acknowledged Costanzo's response, but also wrote, "the inability to establish Wellward under Accrete would be a setback for us all." (*Id.*)

From October to December 2022, Distefano continued to email and converse with Costanza and others at Nordic about a possible Wellward spinoff company.   He also sent a draft business plan to numerous people, asking for their consideration and input.   In those emails, Distefano routinely acknowledged that this proposal was a draft, straw model, or "aspiration" for how a Wellward company would operate, that aspects were subject to change, and that many questions remained. (Dkt. ##143-84, 143-85, 143-86, 143-87, and 143-88.)

### M. Nordic Stops Investing in Wellward

In January 2023, Constanzo told Distefano that Nordic planned to stop investing in the Wellward platform development and would begin focusing on its marketing.   At this point, Nordic had spent over $4 million developing the Wellward Platform, had hired multiple contractors and a sales and marketing lead, and had dedicated several existing employees to work on the Wellward platform.   Costanzo also proposed that Distefano would remain "involved from a sales perspective," with possible, commission-based compensation.   (Dkt. #143-89.)   On January 16, Distefano sent a follow up email to Costanzo, stating: "Haven't heard from you regarding a proposed finder's fee/commission arrangement as you suggested.   Is it in the works or do you have something else in mind?

Please let me know any updates." (*Id.*)  Two days later, however, Nordic notified Distefano

that it had decided not to enter into another agreement with him.  (*Id.*)

On January 24, Distefano then sent Nordic an email stating:

I am very grateful for the opportunities and support afforded me by Nordic over these past 2 1/2 years. I understand the situation may have changed with the acquisition of Nordic by Accrete. However, I plan to move ahead independently with other potential partners in developing the digital platform IP that I initially brought to Nordic unless you have an objection.

(*Id.*)  In response, Nordic's General Counsel Brault emailed: "Can you provide more

specificity around 'the digital platform IP that [you] initially brought to Nordic'? I want

to ensure I understand what you are referring to." (*Id.*)  Distefano wrote back to Brault

that he was referring to "the IP platform now known as Wellward." (*Id.*) Brault again

responded, stating:

I just want to ensure that we are on the same page: all the code, applications (e.g., Connector), schemas, flowcharts, presentations, slides, sales and marketing materials, and other materials related to Wellward have been developed by Nordic resources (its employees and independent contractors) and belong to Nordic (it is Nordic's IP that can be used only by Nordic). Also, Nordic owns the rights to the federally registered mark in Wellward. As for the idea/concept of a digital platform, you are free to pursue it (alone or with other partners), subject to you complying with your confidentiality and other obligations (e.g., not using Nordic's IP) that are outlined in your agreements with Nordic.

(*Id.*)

On February 16, 2023, Distefano filed this lawsuit against Nordic, complaining for

the first time in writing that he had an oral agreement with Costanza regarding IP

ownership, development of Wellward, and creating a separate company to market

Wellward.  Specifically, plaintiffs assert eight claims for relief against defendant:  breach of

oral contract (count I); breach of implied contract (count II); unjust enrichment (count

III); declaration of copyright interests (count IV); breach of written employment agreement (count V); breach of written master services agreement (count VII); and intentional misrepresentation (counts IV, VIII). (Am. Cpt. (dkt. #47).)  In turn, defendant asserts counterclaims against plaintiff Distefano for:  fraudulent misrepresentation based on alleged assertions he made to Nordic regarding Cambia's interest in Wellward; and breach of contract in refusing to grant a license to use any of his IP that was incorporated into Wellward.  Defendant has moved for summary judgment on all of plaintiffs' claims, but not its own counterclaims.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009).  At summary judgment, the court views disputed facts in a light most favorable to the plaintiff as the non-moving party, provided that there is a "genuine" dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Similarly, the court will construe all reasonable inferences in plaintiffs' favor, *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017), but only those favorable inferences that are supported by admissible evidence, not those based upon mere speculation or conjecture, *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017), or upon "[c]onclusory statements,

not grounded in specific facts." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016).

At the same time, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380. In particular, as here, a plaintiff cannot survive summary judgment where their version of events is "so 'internally inconsistent or implausible on its face' that 'no reasonable person would believe it.'" *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1261 (7th Cir. 2025) (*quoting Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997)). Starting with plaintiffs' contract claims, followed by their unjust enrichment, misrepresentation and copyright claims, the court explains below why this is so.

## I.    Breach of an Oral or Implied Contract (Counts I and II)

Defendant seeks summary judgment on plaintiffs' claims for breach of an oral or implied contract, contending that no reasonable jury could find an oral or implied contract ever existed between the parties as to joint, much less exclusive, rights to Distefano's supposed intellectual property. In response, plaintiffs argue that there are disputed issues of material fact regarding whether an oral or implied contract existed on this subject. However, these so-called disputed issues of fact are based entirely on plaintiff Distefano's statements in both his deposition and declaration that he entered into an oral agreement with defendant Nordic's CEO, James Constanzo, that was intended to be separate and

distinct from the written, integrated agreements that he subsequently signed.  For two primary reasons, the court agrees with defendant that no reasonable jury could find an enforceable oral or implied contract existed based on Distefano's statements alone.

### A.  Lack of Intent and Definite Terms

For an oral contract to exist, there must be a mutual meeting of the minds and an intention to contract.  *Theuerkauf v. Sutton*, 102 Wis. 2d 176, 183, 306 N.W.2d 651 (1981).[4]  In addition, a "contract must be definite and certain as to its basic terms and requirements to be enforceable."  *Metropolitan Ventures, LLC v. GEA Associates*, 2006 WI 71, ¶ 22, 291 Wis. 2d 393, 407–408, 717 N.W.2d 58, 66.  Here, plaintiffs have failed to offer sufficient evidence for a reasonable jury to find that Distefano and Constanzo had a "meeting of the minds" and "intention to contract," or that the purported oral contract had "definite and certain" terms.

In fact, plaintiffs' own description of the terms of this supposed "oral agreement" have been inconsistent.  In his original complaint, plaintiffs alleged that the terms of their oral agreement were that "Nordic would use its resources to write the code using its software engineers and form a jointly owned company that would monetize the software platform." (Dkt. #1, ¶ 57.)  In his amended complaint, plaintiffs add that this oral agreement included that (1) Distefano would "control the Nordic software programmers

---

[4] Because all parties assume that Wisconsin law applies here, the court applies the same. *See RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.").

and direct the overall development of the body of software code," and (2) his "contributions would be merged with Nordic's contributions (if any) into inseparable or interdependent parts of a unitary work." (Dkt. 47, ¶ 138.)  The amended complaint also alleges that the "[m]aterial terms of the oral contract are stated in the Operating Agreement" that Distefano sent to Costanzo and Brault on June 20, 2022 (*id.* ¶ 142), despite that draft agreement being created years after any alleged oral agreement *and*, according to Distefano's own contemporaneous communications, being both a "draft" and a "straw model" that required significant work.  Finally, in his deposition, Distefano further testified his 2020 oral agreement with Costanzo included an indefinite expectation that "the specific ownership of the joint company would be determined, at the point of the spin-out, based on the ongoing commitment of resources and the investment made." (Distefano dep. (dkt. #137) 103–04.)

In light of plaintiffs' inconsistent descriptions of the material terms of the putative oral agreement, it is unclear which of these terms are even alleged to be, much less were, a part of this original, oral agreement.  *See Business Syst. Engineering, Inc. v. Int'l Bus. Machines Corp.*, 547 F.3d 882, 887 (7th Cir. 2008) (affirming summary judgment dismissing oral contract claim and noting that the plaintiffs' theory of the alleged oral contract had fluctuated through the proceedings in the case).

Even if a reasonable jury were willing to adopt plaintiffs' most recently alleged terms as comprising the oral agreement, however, those terms are not definite and certain enough as a matter of law to prove a claim for breach of an oral agreement.  *See Ceme-Tube LLC v. Chroma Color Corp.*, 742 F. Supp. 3d 864, 873 (W.D. Wis. 2024) (to form a contract, the

offer must "be so definite in its terms, and require such definite terms in acceptance, that the promises and performances to be rendered by each party are reasonably certain"); *see also Metropolitan Ventures, LLC,* 2006 WI 71, ¶ 22 (same). This is because too many unknowns were present at the time the alleged oral agreement was made in 2020 for those terms to be enforceable. Specifically, it is unclear under the agreement: what IP Distefano would bring to Nordic; how much time, money and resources Nordic would provide to code the digital health platform; how it would be determined that the platform was ready to spinoff as a separate company; or what level of commitment would be required after a new company was formed of Nordic or Distefano, much less how to allocate ownership interest.

Further, Distefano's own written communications to Nordic (both in his demand letters and spinoff proposals) confirm that the parties had *not* reached a binding agreement on certain key terms, particularly relating to IP ownership and organization of the spinoff company. This evidence shows that the purported oral agreement was, if anything, closer to a "promise to form a partnership," with the details of that partnership to be worked out later, and such a promise cannot support a claim for breach of an oral agreement. *See Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.,* 55 F.4th 517, 524-25 (7th Cir. 2022) (holding that the parties did not create a legally binding agreement when they "agreed to form a partnership or joint venture," but the exact legal structure was yet to be determined); *Ceme-Tube,* 742 F. Supp. 3d at 874 (granting summary judgment on the plaintiff's oral contract claim because the plaintiff provided no evidence that the parties ever discussed, much less settled on, essential terms of a binding contract); *Toll Processing*

31

*Services, LLC v. Kastalon, Inc.,* 880 F.3d 820, 829–30 (7th Cir. 2018) (affirming summary judgment on oral contract claim because the evidence established the parties did not have a mutual understanding regarding how long the defendant was required to store "pickle line rolls" that were the subject of the alleged agreement).

Moreover, assuming plaintiffs' general description of the oral agreement was sufficient to set forth the essential terms of a legally binding agreement, plaintiffs have failed to advance sufficient evidence for a reasonable jury to find that *defendant* intended to accept such an oral agreement. "In Wisconsin, the party seeking to enforce a contract must demonstrate that there was a meeting of the minds, that is, that the parties intended to form a contract." *Skyrise Construction Group, Inc. v. Annex Construction, LLC*, 956 F.3d 950, 956 (7th Cir. 2020). The intent of the parties is generally derived from consideration of their words, written and oral, and their actions. *Id.* ("Wisconsin takes an objective view of 'intent,' and therefore secret hopes and wishes count for nothing."). Here, plaintiffs have failed to identify any objective evidence showing defendant's agreement or intent to be bound by the alleged terms of that oral agreement. *See Limecoral, Ltd. v. Careerbuilder, LLC*, 889 F.3d 847, 850 (7th Cir. 2018) (affirming summary judgment on an oral contract claim where the district court found no evidence to support the notion that the defendant had agreed to the terms alleged by the plaintiff).

To the contrary, it is undisputed that Distefano never even shared any arguably protective IP materials with Costanza or Nordic related to his concept for a digital health platform until *after* he started working at Nordic under the First SOW. It is implausible, if not flat out unbelievable, that a company would enter into a sweeping, open-ended IP

and business agreement orally without at least knowing the details of the IP and business proposal. In addition, the only objective evidence in the record shows that despite plaintiffs working for Nordic for almost three years on the digital health platform that became known as Wellward, *both* parties never mentioned any oral agreement or its terms in writing until after plaintiffs filed their complaint in February 2023. *See Limecoral*, 889 F.3d at 850 ("for a period of over six years and two thousand projects, Limecoral has not pointed to evidence showing that CareerBuilder ever paid any renewal fee or that LimeCoral asked for any renewal fee.").

Plaintiffs' failure to cite any objective evidence is especially notable given that the amended complaint alleges that this purported oral agreement "was evidenced and confirmed by written correspondence between the parties and others." (Dkt. #47, ¶ 140.) Indeed, the court specifically relied on this allegation when it issued its order allowing the case to proceed past the motion to dismiss stage. (Dkt. #96, at 18.) Thus, plaintiffs have also failed to meet their burden to come forward with evidence from which a reasonable jury could find that the parties *intended* to form a binding oral contract. *See Ellison v. United States Postal Svc.*, 84 F.4th 750, 759 (7th Cir. 2023) (summary judgment is the "put up or shut up" moment where the non-moving party is required to marshal and present the court with evidence that will prove her case). Regardless, because the parties had not reached agreement on *all* of the materials terms of the alleged oral agreement, it was not sufficiently definite and certain. *Ceme-Tube*, 742 F. Supp. 3d at 874 (granting summary judgment on the plaintiff's oral agreement claim because the plaintiff provided no evidence that the parties ever discussed, much less settled on, other essential terms of a binding contract).

33

## B. Written Agreements

Even more definitively established on this record, the written agreements plaintiffs subsequently signed *expressly* grant Nordic exclusive ownership rights to any intellectual property developed within the scope of plaintiffs' work for Nordic *and* overrode any previous oral or implied agreements regarding plaintiffs' claimed independent IP ownership rights. In particular, as set forth above, the written agreements contain "integration clauses" expressly disclaiming any prior oral agreements. *See Skyrise Construction Group, Inc. v. Annex Construction, LLC*, 956 F.3d 950, 958 (7th Cir. 2020) (the parties contract contained an integration clause, so any claim that the defendant orally changed the agreement must fail); *Ceme-Tube LLC*, 742 F. Supp. 3d 873 (granting summary judgment on an oral contract claim and holding, in part, that alleged oral agreement could not amend the terms and conditions of the written agreement because the written agreement contained an integration provision). Just as definitely, the parties' written agreements expressly assign *exclusive* IP rights to Nordic, with limited exceptions. Specifically, the MSA states "all copyrights, patents, trade secrets or other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes or works of authorship developed or created by [goDesk, LLC] or *its personnel* [Distefano] in connection with the performance or the Services under this Agreement (collectively, "Contract Property") shall belong exclusively to Nordic and shall, to the extent applicable, be considered "work made for hire[.]" (MSA (dkt. #47-2) § III.2.B; ) Finally, the MSA states that "[i]f any element or item of the Contract Property is not a 'work made for hire,'" goDesk "will assign, and shall cause its personnel [Distefano] to assign to Nordic, without any requirement or

34

further consideration, any right, title or interest that Subcontractor and its personnel may have in such Contract Property." (*Id.*)[5] Thus, as applied, the IP provisions and integration clause of the parties' written agreement are legally dispositive of plaintiffs' oral and implied contract claims.

In fairness, plaintiffs offer several arguments to avoid the application of these otherwise binding written agreements, but none is persuasive. First, Plaintiffs argue that the integration clauses cannot supersede *Distefano's* oral agreement with defendant because only goDesk was a party to the MSA, First SOW and Second DOW, not Distefano, citing *GCIU Emp. Ret. Fund v. Chicago Trib. Co.*, 66 F.3d 862, 865 (7th Cir. 1995). However, that case does not help plaintiffs. In *GCIU Emp. Ret. Fund*, the Seventh Circuit held that a contribution agreement cited by the plaintiff *was superseded* by a more recent collective bargaining agreement, holding the party to the second agreement was "acting on behalf" of a party to the first agreement. 66 F.3d at 866. As applied here, goDesk (the party to the second agreement), was certainly "acting on behalf" of Distefano (the party to the alleged first, oral agreement). In particular, the undisputed record shows that the First SOW was intended to cover all Distefano's work for Nordic, but *at* Distefano's request, Nordic agreed to contract with goDesk as the party employing Distefano. Moreover, this was done merely for tax reasons benefiting Distefano, both because of potential tax benefits *and* so Distefano could finish another consulting project through goDesk while also working for Nordic. Regardless, Distefano was the *only* person who ever performed work

---

[5] The Employment Agreement later entered into by Distefano contains similar IP ownership provisions. (Dkt. #47-4, § 7(a).)

for Nordic on behalf of goDesk.  Thus, just as in *GCIU Emp. Ret. Fund*, Distefano and goDesk were essentially the same party.  Of course, both agreements (the alleged oral agreement and the First SOW) covered the same subject matter -- Distefano's work at Nordic -- and goDesk was not only legally bound by the later signed integrated MSA, but expressly was its only "personnel in connection with the performance or the Services under this Agreement," Distefano, who signed the MSA.

Second, plaintiffs argue that Distefano's work on the Wellward platform fell outside the scope of the MSA, First SOW and Employment Agreement, pointing out that neither the First SOW nor the MSA even mention Wellward or software development.  This argument bonders on the frivolous.  To begin, it ignores that the term "Wellward" did not exist until well after Distefano started working at Nordic, so there is no way that the parties would have included the specific term "Wellward" in the First SOW or MSA, but both certainly refer to a software program under development, later called "Pixar" and then "Wellward."  Regardless, the "Engagement Scope" in the First SOW is broadly worded, such that it encompassed all Distefano's potential work as head of Nordic's Advisory Services.  For example, the Engagement Scope required plaintiffs to "provide leadership and subject matter expertise to the leadership of the newly formed Advisory Services division within Nordic" and "provide consultative advice on…solutions development." Because the record shows that Wellward was considered a "solution" developed within the Advisory Services group under Distefano's leadership, his work on Wellward expressly fell under the First SOW.

36

Similarly, the First SOW listed several "engagement objectives" that would encompass Distefano's work on Wellward, including: (1) "identify and recommend opportunities for innovative services/product line extensions that leverage existing capabilities and client relationships; (2) "assess the viability (buy v. build) of expanding Nordic's service offerings"; and (3) "identify and execute enhancements to current business models that maximize revenue, profitability, and client satisfaction." (Dkt. #143-11.) Because Nordic had previously developed software products, including the Health Data Connector that was incorporated into Wellward under Distefano's leadership, Wellward was a "product line extension" and an "enhancement to Nordic's current business model" that fell under the First SOW. Finally, the fact that plaintiffs were paid multiple quarterly incentive bonuses for work on Pixar and then Wellward further supports the conclusion that Distefano's work on Wellward fell within the scope of the First SOW and MSA. Although plaintiffs attempt to argue in their brief that the bonuses were for work outside the Wellward platform, Distefano admitted during his deposition that at least one of the milestones for the Quarterly Incentive Bonus related to his work on Wellward. (Distefano Dep. (dkt. #137) 271.) While plaintiffs attempt to walk this testimony back in their brief, no jury could reasonably accept the convoluted argument over the express terms of the parties' written agreements, nor is it sufficient to avoid summary judgment on the undisputed facts.

Third, plaintiffs argue that Wellward was not subject to the MSA's or SOW's provisions relating to IP ownership because the agreements specifically exempt IP "previously developed" by goDesk/Distefano. (*E.g.,* MSA, Article III, Section 2.A.)

Similarly, the Employment Agreement expressly excluded from "Company Works" any intellectual property that Distefano developed (1) entirely on his own time *or* (2) before working with Nordic. Accordingly, plaintiffs argue that because "Wellward was a fully developed program" and "Nordic simply provided personnel who assisted [Distefano] to code his preexisting vision/schema/IP," all Wellward IP fell within the exception to the IP ownership provisions of the written agreements. (Plts.' Resp. Br. (dkt. #154) 36–37.)

Again, however, the undisputed evidence is otherwise. To begin, plaintiffs cite nothing but Distefano's own, conclusory deposition testimony to support their assertion that Wellward was a "fully developed program," while the record shows Wellward did not even exist until developed by Nordic. Tellingly, plaintiff Distefano cites no computer code, schematics or other documents that would prove his assertion that the program was "fully developed." In fact, he identifies *no* Wellward IP at all to support this argument. Instead, the only documents he cites are PowerPoint presentation slides that he had prepared and copyrighted when he first pitched his conception of such a platform to InComm. Moreover, even assuming this conception had some intrinsic value without years of development into an actual healthcare software platform, Nordic has repeatedly informed Distefano that he can independently continue to use those early documents. Accordingly, his assertion that *other* IP exists falling outside the provisions of the MSA or SOWs is insufficient to avoid summary judgment, particularly where the undisputed evidence shows that Nordic hired programmers to build and develop code *for Wellward*, wholly undermining plaintiffs claim to the program as "fully developed" before Nordic hired and paid subcontractors and programmers to write the computer code for it.

Similarly, besides Distefano's own say-so, plaintiffs cite no evidence that the Wellward IP was developed entirely on his "own time."  To the contrary, Distefano conceded at his deposition that, as an "executive employee," he was salaried, did not have "working hours," and was supposed to dedicate his "full efforts to [his] new job description."  (Distefano dep. (dkt. #137) 286–88.)  Distefano also offers no evidence showing how much time he spent working on Wellward or when, nor does he point to any IP that he created on his own time while simultaneously working for Nordic.  Rather, the only evidence in the record establishes that Distefano worked on Wellward as part of his duties as the head of Advisory Services and he only began to claim independent ownership after it became obvious that Nordic would reject his many entreaties to spin off *its* Wellward platform into a separate company under his control.

In sum, plaintiffs cannot succeed on their oral or implied contract claim because: (1) they have failed to show that an enforceable, oral or implied contract existed; and (2) even if an oral or implied contract existed, it was overridden by subsequent written agreements that plaintiffs entered into with defendant.  Thus, defendant is entitled to summary judgment on plaintiffs' oral and implied contract claims (counts I and II).

## II.     Breach of Contract Claims (Counts V and VII)

Plaintiffs separately contend that defendant breached their relevant written agreements by claiming sole ownership of IP previously developed by Distefano.[6]  To prove

---

[6] Plaintiffs also claimed in their amended complaint that Nordic breached the First SOW by not paying the $25,000 per month fixed services fee for December 2021, and the $15,000 Quarterly Milestone Incentive Bonus for the same period. (Dkt. #47, ¶¶ 195-196.)  However, plaintiffs failed

breach of contract, plaintiffs must show (1) the existence of a contract between the plaintiffs and the defendant; (2) breach of that contract; and (3) damages. *Pines Bach, LLP v. Mills*, No. 22-cv-66-jdp, 2023 WL 6847118, at *2 (W.D. Wis. Oct. 17, 2023) (citing *Pagoudis v. Keidl*, 2023 WI 27, ¶ 12, 406 Wis. 2d 542, 554, 988 N.W.2d 606, 612). Here, plaintiffs cannot show that defendant breached any agreement.

As already discussed above, Nordic is asserting exclusive ownership only in IP developed using Nordic's resources *after* plaintiffs started to do consulting work for Nordic, *expressly including* derivative works for which plaintiffs were required to grant a perpetual, worldwide, nonexclusive, royalty-free license to use, copy, distribute, display, perform, modify, make derivative works of, and otherwise use any pre-existing materials embedded, incorporated or made part of the Wellward platform. (Dft.'s Br. (dkt. #161) 47; MSA (dkt. #47-2) § III.2.C.) Defendant has confirmed in writing that it will not prevent Distefano from using any IP he developed *before* he started this work for Nordic, including his "idea/concept of a digital platform," (Letter from Nordic's counsel (dkt. #143-89)), and plaintiffs cannot articulate an arguable breach by Nordic in use of a software platform it bought and paid for. Indeed, defendant has even agreed that if Distefano had "fully developed" the Wellward concept before coming to Nordic, he can take that concept and hire his own coders to write code for it. (Dft.'s Br. (dkt. #161) 49.) However, defendant argues, and the court agrees, that nothing in the written agreements creates an affirmative obligation by defendant to give Distefano a copy of the source code that it paid employees

---

to respond to defendant's arguments in support of summary judgment on that claim, thereby conceding that defendant is entitled to summary judgment on it.

and subcontractors, including plaintiffs, to write.  Therefore, plaintiffs cannot succeed on their breach of the parties' written contracts.

## III.    Intentional Misrepresentation (Counts VI and VII)

Next, Counts VI and VIII of the amended complaint allege intentional misrepresentation based on defendant's alleged failure to disclose that:  (1) defendant was partnering with plaintiffs only to monetize the Wellward platform for itself and to claim sole ownership; and (2) after the acquisition by Accrete, defendant no longer had authority to spin-out a jointly owned company with Distefano to monetize the Wellward Platform.  (Dkt. #47, ¶¶ 181, 186, 201-202.)  Plaintiffs allege that they would not have entered into any of the written agreements if they had known defendant would claim sole ownership of the Wellward platform.[7]

To succeed on a claim for intentional misrepresentation under Wisconsin law, a plaintiff must prove:  (1) the defendant made a factual representation;  (2) which was untrue;  (3) the defendant either made the representation knowing it was untrue or made

---

[7]  In their brief in opposition to summary judgment, plaintiffs identify several new, false representations that allegedly induced them to enter into the written agreements.  (Dkt. #154, at 70.)  However, the court declines to consider plaintiffs' arguments based on these newly disclosed statements.  *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023) (upholding summary judgment because the plaintiff raised entirely new allegedly fraudulent statements in her opposition to the summary judgment motion that were not pleaded in the first amended complaint); *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *Shaw v. Metzen, Inc.*, No. 13-cv-847-wmc, 2015 WL 5123677, *7 (W.D. Wis. Sept. 1, 2015) (granting summary judgment on a retaliation claim where the plaintiff argued a new theory in the opposition brief that the plaintiff had not pleaded in his complaint); *KDC Foods, Inc. v. Gray, Plant, Mooty, Mooty & Bennett, P.A.*, No. 12–cv–636–bbc, 2013 WL 5777289, *18 (W.D. Wis. Oct. 25, 2013) (granting summary judgment on an alleged fraudulent misrepresentation claim because the complaint only alleged fraud on a failure to disclose).

it recklessly without caring whether it was true or false; (4) the defendant made the representation with the intent to defraud and to induce another to act upon it; and (5) the plaintiffs believed the statement to be true and relied upon it to their detriment. *Kaloti Enters. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205. Plaintiffs claim fails on this record because they cannot prove that defendant made any untrue factual representations. Instead, the evidence establishes that defendant expressly disclosed in written agreements with plaintiffs that it would own any IP created using its own resources. In particular, both the MSA and the Employment Agreement informed Distefano that defendant would own any IP created during the scope of plaintiffs' services. Not only were these IP ownership provisions in the MSA and the Employment Agreement unambiguous, but they were consistent with Distefano's own experience signing other agreements under which defendant would own any IP created by an independent contractor. In short, the contractual terms provide the information that plaintiffs allege defendant failed to disclose and any reliance to the contrary was unreasonable on its face.

In addition, after Nordic was acquired by Accrete, the evidence also shows that *Distefano knew* that defendant needed Board approval to spin-out a jointly owned company with Distefano, and that it lacked such approval. When Distefano negotiated the Second SOW, the evidence shows he was also made aware that defendant had affirmatively *deleted all provisions related to a potential spin-out company*. Nonetheless, plaintiffs signed the Second SOW. Under this set of facts, no reasonable jury could conclude that defendant intentionally misrepresented or surreptitiously omitted any agreement regarding their ownership interest in any IP platform developed using defendant's resources, nor of any

42

commitment to a potential spin-out company, after Distefano started doing consulting work for defendant. Thus, plaintiffs also cannot prove reliance on any such misrepresentations when signing each of the written agreements.

## IV.    Unjust Enrichment (Count III)

Plaintiffs further contend that defendant has been unjustly enriched by claiming ownership of the Wellward platform and source code. To prevail on a claim of unjust enrichment the plaintiff must show that there was: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. *Puttkammer v. Minth*, 266 N.W.2d 361, 363 (1978) (collecting cases). Thus, it "is not enough to establish that a benefit was conferred and retained; the retention must be inequitable." *Id.* Further, a claim of unjust enrichment is not available where the parties have entered into a contract. *Northern Group, Inc. v. Tech 4 Kids*, 352 F. Supp.3d 882, 887 (E.D. Wis. 2018) (quoting *Cont'l Casualty Co. v. Wis. Patients Comp. Fund*, 164 Wis.2d 110, 118, 473 N.W.2d 584 (1991).) "This is because the parties have already bargained for the terms each is willing to accept, and no third person's sense of justice should upset the agreement into which they have freely entered." *Tech 4 Kids*, 352 F. Supp.3d at 887–88.

In this instance, plaintiffs unjust enrichment claim fails because the record shows that the parties entered into *multiple written agreements* that expressly address the ownership

of any IP created during the scope of services.  The parties also negotiated the Second SOW, which deleted any arguable agreement to create a spin-off company for Wellward. Plaintiffs cannot avoid these contractual terms now through an unjust enrichment claim. *See Tech 4 Kids*, 352 F. Supp. 3d at 888 ("Unjust enrichment is not a means for improving the terms of a valid contract.")  Finally, although plaintiffs argue that Wellward falls outside the scope of the written agreements, this argument also fails for all the reasons discussed above.  In short, the record evidence confirms that plaintiffs were acting within the scope of their written agreements during their work on Wellward, and defendant is entitled to summary judgment on plaintiffs' unjust enrichment claim.

## V.    Declaration of Copyright Interest (Count IV)

Count IV of the Amended Complaint seeks a declaration that Distefano is:  (1) the sole author and owner of the materials he created related to the Wellward platform; (2) a joint author of all schematics, flowcharts, presentations, slides, sale and marketing materials, derivative works thereof, and other materials related to the Wellward platform that he created; and (3) a joint author of the software code for the Wellward platform. (Dkt. #47, ¶¶ 168–170.)  Although acknowledging his "Registered Works" are not the Wellward platform, plaintiffs further argue that "they are encompassed in Wellward." (Dkt. #154, at 71.)

Plaintiffs copyright claims cannot succeed for several reasons.  First, plaintiffs fail to identify specifically the "materials" for which he seeks a declaration of copyright ownership. *At most*, plaintiffs have adduced evidence showing that Distefano created ideas,

concepts, and previously-registered works. To begin, Nordic has never disputed Distefano's ownership to previously-registered works, so those works do not appear to be at issue. (Dft.s' Br. (dkt. #139) 62 ("Nordic Does Not Claim Authorship of Pre-Existing Materials Created Before Distefano Began Working For Nordic."). As for Distefano's so-called concepts and ideas, copyright law does not protect those -- it only protects the *fixed* expression of an idea or concept. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea…regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023) (the expression an idea is protectable by copyright, not the underlying facts or ideas themselves); *Gaylord v. U.S.*, 595 F.3d 1364, 1377 (Fed. Cir. 2010). Thus, without evidence that defendant is using Distefano's protected, fixed ideas (*i.e.,* his previously registered works -- the seven specific documents that Distefano registered with the U.S. Copyright Office) -- as part of the Wellward code or in any other documents, it is irrelevant to copyright law whether Wellward incorporated Distefano's ideas into its work. Plaintiff offers no such evidence.

Regardless, as discussed throughout this opinion, the MSA and Employment Agreement *both* provide that *defendant* would be the exclusive owner of any IP created during plaintiffs' work for defendant. In addition, under the Copyright Act, an employer, like defendant, is the author and owner of any works made by its employees working within the scope of their employment or engagement. Specifically, the Copyright Act defines "a work prepared by an employee within the scope of his or her employment" as a "work made for hire," 17 U.S.C. § 101(1), *and* the employer owns all "works made for hire,"

unless the parties agree otherwise in a separate signed written agreement. *Id.* at § 201(b).[8] Since the opposite is indisputably true here, because Distefano's work on the Wellward platform was expressly *within* the scope of the parties' written agreements, defendant owns any IP related to Wellward under the written agreements *and* as "works made for hire."

Nor can Distefano succeed on his claim that he is a "joint author" of the Wellward platform code or other materials created while working for defendant as a consultant and employee. The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In a joint work the co-authors hold undivided interests in a work, despite any differences in each author's contribution. 17 U.S.C. § 201. Each author has the right to use or license the use of the work, subject to an accounting to the other co-authors for any profits. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994); *Weinstein v. University of Illinois*, 811 F.2d 1091, 1095 (7th Cir. 1987). Thus, even a person whose contribution is relatively minor enjoys a significant benefit, if deemed to be a joint author. *Erickson*, 13 F.3d at 1068.

---

[8] In their opposition brief, plaintiffs raise new copyright claims that were not included in their amended complaint, including that defendant must transfer copyright interests to Distefano pursuant to the alleged oral agreement and that Distefano is the owner of the Wellward code under the "work made for hire" doctrine because he was the *de facto* employer of the Wellward coders. The court declines to consider these new claims made for the first time at summary judgment, but even if it did, they would fail on the merits. As discussed above, there was no valid oral agreement between Distefano and defendant; nor is there evidence that support a finding that Distefano was the employer of the Nordic employees who wrote code for Wellward. The evidence instead shows that Distefano never paid any of the subcontractors' salary and the subcontractors had written agreements with Nordic, not Distefano.

However, merely because two people collaborate to create a work does not make them "joint authors." *Id.* at 1068–69.  To establish that their contributions were significant enough to make him a joint author, a party must show that they and the other party:  (1) intended to create a joint work; and (2) each contributed independently copyrightable material.  *Id.* at 361.  Certainly, Distefano *proposed* the idea of creating a digital health software platform for defendant and led the team that eventually coded the platform, however, the fact that the software was Distefano's idea or even came to fruition under his leadership is not enough to make him a joint author.  "To qualify as an author of the computer program, he must have translated his ideas into a fixed, tangible expression entitled to copyright protection." *Woods v. Resnick*, 725 F. Supp. 2d 809, 819 (W.D. Wis. 2010) (citing *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 737 (1989); 17 U.S.C. § 102; *see also Publications Intern., Ltd. v. Meredith Corp.,* 88 F.3d 473, 481 (7th Cir.1996) ("Protection for ideas or processes is the purview of patent.").)

Here, plaintiffs have failed to identify any specific contribution of independently copyrightable material by Distefano.  At most, plaintiffs seek a declaration that Distefano is a joint author of all "schematics, flowcharts, presentations, slides, sale and marketing materials, derivative works thereof," but plaintiffs fail to point to any evidence showing specific "schematics, flowcharts, presentations, slides, sale and marketing materials, derivative works thereof" that Distefano authored independently, save a few, early conceptual documents.  Similarly, Distefano has failed to identify any specific code that he wrote for the Wellward platform.  Thus, no reasonable jury could find that Distefano is a joint author of the Wellward code.  *See Woods*, 725 F. Supp. 2d at 819–20 (granting

summary judgment on copyright claim for joint authorship, even though it was undisputed that defendant came up with the idea and provided direction to coder, where the defendant could not identify how many lines of source code he wrote, the subject matter of the source code he wrote, or more specifics about the coding sessions the defendant alleged occurred). Therefore, defendant is entitled to summary judgment on plaintiffs' copyright claims as ell.

ORDER

IT IS ORDERED that:

1) Defendant Nordic Consulting Partners, Inc.'s motion for summary judgment (dkt. #138) is GRANTED in full.

2) This case shall proceed to trial solely on defendant's counterclaims.

Entered this 19th day of November, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge